RECORD NUMBER: 09-2135

# United States Court of Appeals

*for the*

# Fourth Circuit

---

**CSX TRANSPORTATION, INC.,**

*Plaintiff-Appellant,*

– v. –

**ROBERT V. GILKISON; PEIRCE, RAIMOND & COULTER, PC,**
**a/k/a Robert Peirce & Associates, P.C., a Pennsylvania Professional Corporation; JOHN**
**DOES; ROBERT N. PEIRCE, JR.; LOUIS A. RAIMOND; MARK T. COULTER; RAY**
**A. HARRON, Dr.,**

*Defendants-Appellees,*

**RICHARD CASSOFF, M.D.,**

*Party-in-Interest,*

**LUMBERMENS MUTUAL CASUALTY COMPANY,**

*Intervenor.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING (STAMP, J.)

## BRIEF OF APPELLEES

**ROBERT A. LOCKHART**
SCHUDA & ASSOCIATES, PLLC
**232 Capitol Street, Suite 200**
**Charleston, WV 25301**
**(304) 343-8928**

**WALTER P. DEFOREST**
**DAVID J. BERARDINELLI**
**MATTHEW S. MCHALE**
DEFOREST KOSCELNIK
 YOKITIS KAPLAN & BERARDINELLI
**436 Seventh Avenue, 30th Fl.**
**Pittsburgh, PA 15219**
**(412) 227-3100**

*Counsel for Peirce, Raimond & Coulter, PC;*
*Robert N. Peirce, Jr.; Louis A. Raimond; and Mark T. Coulter*

*Additional Counsel on Inside Cover*

 COUNSEL PRESS • VA – (800) 275-0668

**LAWRENCE S. GOLDMAN**
**ELIZABETH M. JOHNSON**
**LAW OFFICES OF LAWRENCE S. GOLDMAN**
**500 Fifth Ave, 29th Fl.**
**New York, NY 10110**
**(212) 997-7499**

**JERALD E. JONES**
**WEST & JONES**
**360 Washington Avenue**
**Clarksburg, WV 26301**
**(304) 624-5501**

**RON BARROSO**
**5350 S. Staples, Suite 401**
**Corpus Christi, TX 78411**
**(361) 994-7200**

*Counsel for Ray A. Harron*

**JOHN E. GOMPERS**
**GOMPERS, MCCARTHY & MCCLURE**
**60 Fourteenth Street**
**Wheeling, WV 26001**
**(304) 233-2450**

**STANLEY W. GREENFIELD**
**GREENFIELD & KRAUT**
**1040 Fifth Avenue, 3rd Fl.**
**Pittsburgh, PA 15219**
**(412) 261-4466**

*Counsel for Robert V. Gilkison*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2135    Caption: CSX Transportation, Inc. v. Robert Gilkison

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert Gilkison          who is    Appellee           , makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☒ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☒ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☒ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☒ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on  October 14, 2009      the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

Oct. 14 2008
(date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2135     Caption: CSX Transportation, Inc. v. Robert V. Gilkison, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Peirce, Raimond & Coulter who is _____ appellee _____, makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
*****************************

I certify that on October 15, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see Certificate of Service, attached.

s/Walter Pattison DeForest III                    10/15/2009
          (signature)                               (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than
one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or
mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici
curiae are required to file disclosure statements. Counsel has a continuing duty to update this
information.

No. 09-2135    Caption: CSX Transportation, Inc. v. Robert V. Gilkison, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert N. Peirce, Jr. who is appellee , makes the following disclosure:
(name of party/amicus)    (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
2.    Does party/amicus have any parent corporations? ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on October 15, 2009 the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Please see Certificate of Service, attached.

s/Walter Pattison DeForest III                    10/15/2009
_____            _____
(signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2135     Caption: CSX Transportation, Inc. v. Robert V. Gilkison, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Louis A. Raimond _____ who is _____ appellee _____, makes the following disclosure:
(name of party/amicus)              (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on October 15, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see Certificate of Service, attached.

s/Walter Pattison DeForest III                     10/15/2009
_____                     _____
        (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2135    Caption: CSX Transportation, Inc. v. Robert V. Gilkison, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mark T. Coulter _____ who is _____ appellee _____, makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on October 15, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see Certificate of Service, attached.

s/Walter Pattison DeForest III _____          10/15/2009 _____
        (signature)                                (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-2135    Caption: CSX Transportation, Inc. v. Robert Gilkison

Pursuant to FRAP 26.1 and Local Rule 26.1,

Ray A. Harron, M.D. who is _____ Appellee _____, makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
   If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on October 16, 2009 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    Octor 16, 2009
(signature)                                (date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ................................................................................... 1

STATEMENT OF THE CASE ................................................................. 4

STATEMENT OF FACTS ....................................................................... 7

    A.   THE DISTRICT COURT DISMISSED CSX'S RICO AND FRAUD
        COUNTS AS TIME-BARRED ............................................................. 7

    B.   THE DISTRICT COURT DENIED CSX LEAVE TO AMEND A SECOND
        TIME ........................................................................................... 9

    C.   THE DISTRICT COURT AWARDED SUMMARY JUDGMENT TO
        DEFENDANTS ON THE BAYLOR CLAIMS ........................................ 11

        1.   Summary of Relevant Facts ................................................. 12

        2.   Additional Undisputed Record Evidence Related To Baylor's
            Condition ............................................................................ 13

        3.   The Lawyer Defendants' Limited Involvement in Baylor's
            Claim .................................................................................. 18

        4.   CSX's Release from Liability Obtained from Baylor ............. 18

    D.   THE DISTRICT COURT PROPERLY EXCLUDED CERTAIN
        IMPEACHMENT EVIDENCE AT TRIAL OF THE MAY FRAUD ............ 19

SUMMARY OF ARGUMENT ................................................................ 21

    A.   THE DISTRICT COURT'S STATUTE OF LIMITATIONS DECISION ...... 21

    B.   THE DISTRICT COURT'S DENIAL OF LEAVE TO AMEND ................. 23

    C.   THE DISTRICT COURT'S SUMMARY JUDGMENT AS TO THE BAYLOR
        CLAIMS ...................................................................................... 24

i

D.    THE DISTRICT COURT'S EXCLUSION OF IMPEACHMENT EVIDENCE ...............24

STANDARD OF REVIEW ....................................................................................25

ARGUMENT ......................................................................................................25

A.    THE DISTRICT COURT'S STATUTE OF LIMITATIONS DECISION WAS
       APPROPRIATE AND SHOULD BE UPHELD ......................................................25

   1.    CSX Waived Any Argument Regarding the Separate Accrual
          Rule .......................................................................................................25

   2.    The District Court Properly Found CSX's Claims Time-Barred
          Under the Injury Discovery Rule ..........................................................26

   3.    This Court Should Not Adopt a Separate Accrual Rule ........................ 34

      a.    A Separate Accrual Rule Is Contrary to RICO's Underlying
             Policies As Expressed in Rotella.........................................................35

      b.    RICO's Injury Discovery Rule Provides Protections That
             Make It Unnecessary to Adopt the Separate Accrual Model..............39

   4.    The Separate Accrual Rule Does Not Save CSX's RICO
          Claims....................................................................................................41

   5.    Alternative Grounds Exist for Upholding  the Dismissal of
          CSX's Claims .........................................................................................42

      a.    Noerr-Pennington Doctrine.................................................................42

      b.    CSX Had Access to the Information to Which the Alleged
             Fraud Is Based, Precluding a Finding of Fraud ..................................43

      c.    Failure to Demonstrate a Pattern of Racketeering Activity................45

B.    THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING
       CSX LEAVE TO AMEND TO FILE ITS SECOND AMENDED
       COMPLAINT ...............................................................................................46

1.    The District Court Did Not Abuse Its Discretion in Finding That CSX Acted with a Dilatory Motive ................................................46

2.    Leave to Amend Was Properly Denied As Futile...................49

3.    Leave to Amend Was Properly Denied As Prejudicial...........................49

C.    BASED ON CSX'S OWN ADMISSIONS, THE DISTRICT COURT PROPERLY ENTERED SUMMARY JUDGMENT ON THE BAYLOR CLAIMS ......................................................................................50

1.    Summary Judgment Was Proper Based on the Undisputed Record ................................................................................51

a.    No Fraudulent Misrepresentation As Alleged by CSX Occurred ...............................................................52

b.    The Undisputed Record Established That a Good Faith Basis Existed for Filing Baylor's Claim Precluding a Finding of Fraudulent Intent ................................................53

2.    Alternative Grounds Exist for Granting Summary Judgment.................60

a.    CSX's Release from Baylor Precludes Fraud......................................60

b.    Noerr-Pennington.................................................................61

c.    The Lack of Personal Involvement by Mr. Raimond and Mr. Peirce in the Filing of Baylor's Claim Precludes a Finding of Personal Liability for Fraud ................................................62

d.    Dr. Breyer's Opinion Precludes Liability for Dr. Harron....................63

D.    THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN REFUSING TO ADMIT, AT THE TRIAL OF THE MAY FRAUD, CERTAIN EVIDENCE UNRELATED TO ANY ALLEGED FRAUD AGAINST CSX ...............64

CONCLUSION ....................................................................................66

iii

REQUEST FOR ORAL ARGUMENT ..................................................................68

CERTIFICATE OF COMPLIANCE ...................................................................69

CERTIFICATE OF SERVICE .............................................................................71

# TABLE OF AUTHORITIES

## CASES

*Agency Holding Corp. v. Malley-Duff & Assocs.*,
    483 U.S. 143 (1987) ...................................................................27

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................50

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
    237 F.3d 394 (4th Cir. 2001)......................................................42

*Baylor v. CSX Transportation, Inc.*,
    Civil Action No. 01-C-3955 (Kanawha County, W. Va.) ...............18

*Bregman, Berbert & Schwartz, L.L.C. v. United States*,
    145 F.3d 664 (4th Cir. 1998)......................................................25

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993)................................................ 33, 34

*Capitol Chrysler-Plymouth, Inc. v. Megginson*,
    532 S.E.2d 43 (W. Va. 2000) .....................................................44

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................58

*Chaudhry v. Gallerizzo*,
    174 F.3d 394 (4th Cir. 1999)......................................................47

*Cherrey v. Diaz*,
    991 F.2d 787, 1993 WL 118099 (4th Cir. 1993) ..................... 27, 34

*Cordial v. Ernst & Young*,
    483 S.E.2d 248 (W. Va. 1996).....................................................44

*Deasy v. Hill*,
    833 F.2d 38 (4th Cir. 1987)...........................................................................47

*DeShazo v. Nations Energy Co.*,
    286 F. App'x. 110 (5th Cir. 2008) ...................................................... 38, 39, 41

*Detrick v. Panalpina, Inc.*,
    108 F.3d 529 (4th Cir. 1997).......................................................................27

*Foman v. Davis*,
    371 U.S. 178 (1962) .................................................................................. 47, 48

*G-I Holdings, Inc. v. Baron & Budd*,
    179 F. Supp. 2d 233 (S.D.N.Y. 2001)...........................................................31

*GO Computer, Inc. v. Microsoft Corp.*,
    508 F.3d 170 (4th Cir. 2007).......................................................................32

*Hemi Group, LLC v. City of New York*,
    130 S.Ct. 983, 2010 WL 246151 (2010)........................................................42

*HJ Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ...................................................................................45

*Igen International, Inc. v. Roche Diagnostics*,
    335 F.3d 303 (4th Cir. 2003).................................................................. 42, 43

*In re Silica Products Liability Litigation*,
    398 F. Supp. 2d 563 (S.D. Tex. 2005) .............................................. 12, 14, 34

*JKC Holding Co. v. Washington Sports Ventures, Inc.*,
    264 F.3d 459 (4th Cir. 2001).......................................................................51

*Jones v. Bock*,
    549 U.S. 199 (2007) ...................................................................................28

*Jones v. Liberty Mut. Ins. Co. (In re The Wallace & Gale Co.)*,
    385 F.3d 820 (4th Cir. 2004)............................................................ 25, 48, 65

*Kearney v. Foley & Lardner, LLP,*
 590 F.3d 638 (9th Cir. 2009)...........................................................43

*Keller v. Prince George's County,*
 923 F.2d 30 (4th Cir. 1991)............................................................49

*Klehr v. A.O. Smith Corp.,*
 521 U.S. 179 (1997) ................................................... 33, 35, 36, 40

*Lanza v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. P'ships Litig.),*
 154 F.3d 56 (2d Cir. 1998).............................................................33

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
 318 F.3d 148 (2d Cir. 2003)...........................................................31

*Lengyel v. Lint,*
 280 S.E.2d 66 (W. Va. 1981)..........................................................61

*Limestone Dev. Corp. v. Village of Lemont,*
 520 F.3d 797 (7th Cir. 2008)..........................................................28

*Love v. National Medical Enterprises,*
 230 F.3d 765 (5th Cir. 2000).................................................... 38, 39

*Mathews v. Kidder, Peabody & Co.,*
 260 F.3d 239 (3d Cir. 2001)...........................................................33

*Meyer v. Berkshire Life Ins. Co.,*
 372 F.3d 261 (4th Cir. 2004)..........................................................52

*Miller v. Huntington & Ohio Bridge Co.,*
 15 S.E.2d 687 (W. Va. 1941)..........................................................54

*Molinary v. Powell Mountain Coal Co.,*
 125 F.3d 231 (4th Cir. 1997)..........................................................64

*Omni Outdoor Advertising Inc. v. Columbia Outdoor Advertising, Inc.,*
 974 F.2d 502 (4th Cir. 1992)..........................................................48

*Perrian v. O'Grady*,
    958 F.2d 192 (7th Cir. 1992)................................................................46

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987)...................................................... 27, 34

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ...............................................................................42

*Raymark Indus., Inc. v. Stemple*,
    No. 88-1014, 1990 WL 72588 (D. Kan. 1990) ...................................31

*Rollison v. Washington Nat'l Ins. Co.*,
    176 F.2d 364 (4th Cir. 1949).................................................................44

*Rotella v. Wood*,
    528 U.S. 549 (2000) ............................................................... passim

*Sandcrest Outpatient Servs., P.A. v. Cumberland Cty. Hosp. Sys. Inc.*,
    853 F.2d 1139 (4th Cir. 1988).............................................................47

*Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc.*,
    180 F.3d 583 (4th Cir. 1999)...............................................................57

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) .................................................................. 45, 46

*Toll Bros., Inc. v. Dryvit Sys., Inc.*,
    432 F.3d 564 (4th Cir. 2005)...............................................................42

*Trafalgar House Constr., Inc. v. ZMM, Inc.*,
    567 S.E.2d 294 (W. Va. 2002).............................................................34

*United States v. MacDonald*,
    688 F.2d 224 (4th Cir. 1982)...............................................................65

*United States v. Nerlinger*,
    862 F.2d 967 (2d Cir. 1988)................................................................63

*United States v. Pittman*,
　　209 F.3d 314 (4th Cir. 2000)..........................................................46

*United States v. Simpson*,
　　910 F.2d 154 (4th Cir. 1990)..........................................................65

*United States v. Tindle*,
　　808 F.2d 319 (4th Cir. 1986).................................................... 65, 66

*United States v. U.S. Gypsum Co.*,
　　438 U.S. 422 (1978) ......................................................................63

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
　　67 F.3d 605 (7th Cir. 1995)............................................................28

*White v. National Steel Corp.*,
　　938 F.2d 474 (4th Cir. 1991).................................................... 51, 56

*Wimm v. Jack Eckerd Corp.*,
　　3 F.3d 137 (5th Cir. 1993)..............................................................46

*Yourtee v. Hubbard,*
　　474 S.E.2d 613 (W. Va. 1996) .......................................................64

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
　　401 U.S. 321 (1971) ......................................................................40

## STATUTES

18 U.S.C. § 1962(c) ...........................................................................27

18 U.S.C. § 1962(d) ...........................................................................27

6 Wright & Miller, Federal Practice and Procedure § 1488 ....................47

Fed. R. Civ. P. 9 ...................................................................................4

Fed. R. Evid. 103 ...............................................................................66

Fed. R. Evid. 401 ...................................................................... 21, 24, 64

Fed. R. Evid. 403 .............................................................. 21, 24, 64, 65

Fed. R. Evid. 404 ...................................................................... 21, 24, 64

W. Va. Code § 55-2-12 ........................................................................34

## OTHER AUTHORITIES

David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation,*
    31 Pepp. L. Rev. 11 (2003) ...............................................................32

Jed S. Rakoff & Howard W. Goldstein,
    *RICO: Civil and Criminal Law* § 3.04 (2008) .................................35

Matthew Bergman & Jackson Schmidt, Op-Ed., *Change Rules on Asbestos
    Lawsuits,* Seattle Post-Intelligencer, May 30, 2002.........................32

Susan Warren, *Competing Claims: As Asbestos Mess Spreads, Sickest See Payouts
    Shrink,* Wall St. J., Apr. 25, 2002 ..................................................32

## **INTRODUCTION**

This appeal is not about tort reform, nor about an alleged scheme to manufacture asbestos claims, nor about a case litigated in the Southern District of Texas five years ago that did not involve Robert Peirce & Associates (the "Peirce Firm") or its lawyers.  Rather, this appeal concerns four distinct legal decisions made by the district court judge, the Honorable Frederick P. Stamp:

(1)     A decision dismissing Counts 1 and 2 (and parts of Counts 3 and 4) of the Amended Complaint as time-barred because, *inter alia*, the first complained-of lawsuit put in issue by CSX was filed in March 2000 and *settled* in August 2002, yet CSX did not assert its RICO-related claims until July 2007;

(2)     A decision denying CSX leave to file a Second Amended Complaint that, *inter alia*, asserted allegations based on information that CSX possessed when it filed its Amended Complaint and denying leave sought by CSX only after CSX—on two prior occasions—had the bulk of its purported claims dismissed by the district court;

(3)     A decision granting summary judgment in favor of Mr. Peirce, Mr. Raimond, and Dr. Harron on fraud and conspiracy allegations related to an asbestosis suit filed on behalf of Earl Baylor, which suit was based on a chest x-ray that CSX and its own expert admit *could reasonably be read as*

1

*positive for asbestosis*.  Further, unbeknownst to Defendants, years before the Peirce Firm filed suit, CSX had paid Baylor to settle a prior asbestosis claim and obtained a release from him that protected CSX from having to defend against the case filed by the Peirce Firm.  That prior claim was brought by other lawyers.  This release—which CSX did not disclose to Defendants until two years after the Amended Complaint was filed—provides an alternative ground for affirming the district court because it establishes that CSX could not have been defrauded by Baylor's second suit; and

(4)     An evidentiary ruling, at the trial which ended in a defense verdict, to exclude certain impeachment evidence that did not concern claims against CSX—evidence concerning a witness who was not alleged to have participated in the fraud being tried, and which did not involve the alleged participant in the fraud.

A detailed review of the record evidence—including CSX's own self-defeating admissions—and established law demonstrates that the district court's decisions should be upheld.

Rather than address the relevant record evidence and the bases for the district court's decisions, CSX attempts, on appeal, to turn this case into what it was not in the trial court: a case about tort reform and a vehicle for eradicating the

claimed perils of asbestos litigation. It does so by flooding this Court with irrelevant details unrelated to the four legal decisions at issue—such as the criminal record of Mr. Corbitt, an x-ray technician, and Dr. Harron's license suspensions that occurred *after* his work for the Peirce Firm—and by recasting the district court's decisions and the rationales underlying them.

CSX also urges arguments to this Court that it failed to raise below. Most notably, while CSX urges this Court to break new ground in adopting a separate accrual rule governing the RICO statute of limitations and faults the district court for not doing so, CSX fails to acknowledge that it did not ask the district court to adopt such a rule until *after* the district court had already found CSX's claims to be time-barred.

Additionally, while CSX claims the factual record was sufficient to avoid summary judgment related to Baylor's claim, it neglects to inform the Court that CSX and its expert admitted that Baylor's x-ray *could* reasonably be read as positive for asbestosis. Thus, as the district court held, it is impossible to show that the suit was fraudulent.

When the actual record and the relevant facts and law are considered, the district court's decisions should be affirmed.

## STATEMENT OF THE CASE

This lawsuit was originally filed by CSX in December 2005. JA6. The original complaint alleged claims against the Peirce Firm and Robert Gilkison for fraud. The fraud allegations against the Peirce Firm were based on a theory of vicarious liability for the claimed actions of Gilkison who allegedly aided Ricky May in pursuing a fraudulent asbestos claim against CSX—May had another individual (Daniel Jayne) sit for his chest x-ray. JA165–78, 1360. Additionally, based on claims of negligence concerning the operation of asbestosis screenings for injured workers, CSX attempted to assert a broad attack on the Peirce Firm's Federal Employer Liability Act practice. The district court's March 16, 2007 decision granting the Peirce Firm's motion for judgment on the pleadings as to CSX's negligence claims limited the scope of CSX's attack. JA115–26. That decision has not been appealed.

On June 20, 2007, the district court further narrowed CSX's original claims by dismissing, under Fed. R. Civ. P. 9, "John Doe" allegations regarding other suspected frauds similar to the May fraud. JA132–41. That decision has not been appealed.

Referring to the dismissal of the "John Doe" allegations, the district court did grant CSX an opportunity to amend, stating: "CSX Transportation, Inc. is

4

GRANTED leave to amend its complaint to state additional fraud claims with the requisite particularity." JA140.

CSX filed an Amended Complaint on July 5, 2007. JA142–79. The Amended Complaint did not assert any additional similar frauds to May's fraud, nor did it assert any new counts against the defendants named in the original Complaint. Instead, the Amended Complaint added four new individual defendants—Robert Peirce, Jr., Louis Raimond, Mark Coulter, and Ray Harron, M.D.—and asserted four new causes of action against them (civil RICO, RICO conspiracy, fraud, and civil conspiracy) based on new theories. CSX's new allegations stemmed from nine allegedly fraudulent suits filed on behalf of clients. The Peirce Firm was not named as a defendant with regard to these new claims.

The district court subsequently dismissed, under RICO's four-year statute of limitations and West Virginia's two-year statute of limitations for common law fraud, many of the claims in CSX's Amended Complaint. JA691–704. The district court based that decision on the fact that the lawsuits that CSX alleged to be fraudulent had been filed as early as 2000 and certain of them settled as early as 2002—seven and five years, respectively, prior to the filing of the Amended Complaint. JA696–97. *In responding to the motion to dismiss its claims as time-barred, CSX did not raise or discuss the separate accrual rule that it now asks this Court to adopt. See* JA778 n.6; Doc. No. 234 at 21–23.

5

CSX moved for reconsideration and for leave to file a Second Amended Complaint. These motions were denied by Orders dated November 3, 2008. JA772–95. With regard to the motion to amend, the district court based its denial on three independent grounds: (1) CSX acted with a dilatory motive in that it had the relevant information it sought to use in its Second Amended Complaint at the time it filed the Amended Complaint but elected not to include it, (2) any amendment was futile based on the court's statute of limitations decision, and (3) the proposed amendment would prejudice the Defendants. JA785–95. After these decisions, the only new claims from the Amended Complaint that remained were a common law fraud claim and a related conspiracy claim concerning a lawsuit brought on behalf of Baylor.

CSX's fraud claims concerning the May fraud were tried to a jury in August 2009. The jury returned a verdict in favor of all the Defendants. JA2067.

With regard to the fraud and conspiracy claims concerning Baylor, the district court granted summary judgment on September 15, 2009. JA2083–97. Among other things, the district court found that CSX's admissions that Baylor's x-ray could be read as positive for asbestosis and the undisputed fact that the Peirce Firm had Baylor's x-ray re-read by a doctor *other than Dr. Harron* before filing suit precluded CSX from demonstrating fraud by clear and convincing evidence. JA2091–93.

6

Having awarded summary judgment on those grounds, the district court did not decide a pending motion to dismiss CSX's claims based on the prior release it had obtained from Baylor. JA2095–96.

## STATEMENT OF FACTS

A.    The District Court Dismissed CSX's RICO and Fraud Counts as Time-Barred

The district court dismissed CSX's RICO and RICO conspiracy counts, as well as eight of nine common law fraud counts, on statute of limitations grounds. The face of the Amended Complaint and the exhibits attached thereto demonstrated that, during the course of the underlying asbestosis lawsuits, CSX had access to, *inter alia*, an asbestosis claimant's positive x-ray and the related ILO form.[1]    JA153–54, 681–82, 229–247.    CSX also had the right to take short depositions of claimants.    JA681–82.    Any cases transferred to the trial docket would begin "full discovery" with court permission.    JA680.

The RICO claims asserted in CSX's Amended Complaint were premised on claims filed on behalf of nine railroad workers.[2]    Eight of the nine suits that comprised the purported predicate acts for CSX's civil RICO and RICO conspiracy

---

[1]    The ILO forms indicate, *inter alia,* the severity of the profusion of abnormalities, the zone where the abnormalities were observed, and the quality of the x-ray.

[2]    The Amended Complaint and Exhibits refer to 4,743 claims filed by the Peirce Firm against CSX.    JA250-676.    Of those claims, only nine were alleged to be fraudulent, amounting to less than 0.2% of the claims filed over a six-year period.

claims were filed on or before *May 19, 2003*, more than four years before CSX filed its Amended Complaint on *July 5, 2007*. The first such suit was filed on *March 20, 2000, and settled on August 1, 2002*, respectively seven and five years before the Amended Complaint was filed. JA156–59.

CSX asserted that it was injured by all nine allegedly "fabricated" claims, three of which (including Baylor's) had not even been settled. JA156–60. As its own pleadings alleged, CSX's purported injuries began when suit was filed by causing CSX "to expend substantial money and resources to defend and settle" the allegedly fabricated claims. JA163, 164.

Given these pled facts, the district court held that, under the injury discovery rule, CSX had inquiry notice of any claimed fraud when the "claims against it were filed and/or settled." JA698. Specifically, the district court held that "[a]t the very least, on the face of the amended complaint, CSX knew or should have known it was injured prior to *settling* three of the nine cases." JA699 (emphasis added). The three cases referenced by the district court were filed on March 20, 2000 (Sanders), August 1, 2001 (Lackey) and August 1, 2001 (Bronson), and settled on August 1, 2002 (Sanders), November 17, 2002 (Lackey) and June 26, 2003 (Bronson). JA156–57. All of the above facts cited by the district court were pled by CSX or were self-evident from the Amended Complaints exhibits.

8

The district court reaffirmed the basis for this decision in denying CSX's motion to amend, emphasizing that "three of the lawsuits were settled more than four years prior to the filing of the amended complaint."  JA697.

In rendering its statute of limitations decision, the district court did not mention or discuss the separate accrual rule.[3]  CSX never raised the separate accrual rule or asked the district court to apply it during the briefing on Defendants' motion to dismiss.  JA778–79.  CSX did not raise the separate accrual rule until it filed its *reply* brief in support of its motion for *reconsideration* on April 29, 2008.  JA778–79, Doc. No. 275 at 3-5.  Given this timing, the district court found that CSX's argument related to the separate accrual rule was untimely and did "not merit an alteration" of its decision. JA778–79.

B.    The District Court Denied CSX Leave to Amend a Second Time

CSX did not file its Amended Complaint until after the district court ruled against it and dismissed much of the original Complaint.  Then, only after the district court's decision dismissing Counts 1 and 2 (and parts of Counts 3 and 4) of the Amended Complaint, did CSX seek to file a Second Amended Complaint. JA22–23.    The  proposed  Second  Amended  Complaint  purported  to  assert

---

[3] The district court did indicate that, with only the Baylor claim remaining, CSX could not establish the pattern of racketeering activity required by RICO, but that discussion did not support the court's application of the injury discovery rule, and the court did not discuss or mention the separate accrual rule.  JA699–700.

9

additional examples of allegedly fraudulent claims filed on behalf of seven clients. By its own admission, CSX had possession of the x-rays and other information on which the proposed Second Amended Complaint was based since at least November 2006—*eight months before* the original Amended Complaint was filed and *eighteen months before* requesting leave to file the Second Amended Complaint. JA747, 765.

The district court found that CSX acted with a dilatory motive in seeking to file the Second Amended Complaint. The district court expressly held that "[b]ased on CSX's own admissions, it appears that CSX was fully aware of these facts prior to its filing of its first amended complaint. Yet, instead of asserting these [seven] allegedly fraudulent claims in the first amended complaint, CSX has waited until now to include them and has offered no good reason for its actions." JA790. The district court further noted "it is curious that CSX's motion for leave to file a second amended complaint follows this Court's recent decisions dismissing several claims against the lawyer defendants and Dr. Harron." JA790–91.

In addition to denying leave based on CSX's dilatory motive, the district court also found that the proposed amendment was futile based on its statute of limitations decision and found the proposed amendment to be prejudicial because it would greatly expand discovery. JA793–95.

While in its brief here, CSX admits that it had the relevant x-rays in November 2006, it argues to this Court, without any record citation, that "it was unable to process and evaluate the hundreds of x-rays until after the district court's deadline for the amended complaint had passed." CSX Br. at 36. CSX incredibly contends that it could not have evaluated "hundreds of x-rays" in the *eight months* between November 2006 and the date the Amended Complaint was filed. CSX made no such argument to the district court and, indeed, the record contains no basis for this assertion. *See* Doc. Nos. 278, 282.

C.    The District Court Awarded Summary Judgment to Defendants on the Baylor Claims

The district court's March 28, 2008 Order limited this matter to an alleged fraud claim and related conspiracy claim concerning a single asbestos lawsuit filed by the Peirce Firm on behalf of Baylor. Mr. Peirce and Mr. Raimond as individuals were the only defendants, along with Dr. Harron, in the counts related to Baylor—the Peirce Firm was not a defendant in those counts.

CSX's fraud and civil conspiracy allegations related to the asbestosis claim of Baylor were based on the premise that an alleged fraudulent scheme existed between Mr. Peirce and Mr. Raimond and Dr. Harron concerning Baylor's claim, and that CSX was fraudulently deceived into believing that the claim had merit. JA153–59. The core of the alleged scheme was articulated by CSX as follows: Dr. Harron falsely read Baylor's June 11, 2003 chest x-ray as showing signs of

11

asbestosis (after previously reading an August 4, 1999 x-ray of Baylor as negative), and Mr. Peirce and Mr. Raimond then knowingly (or recklessly) filed suit on the basis of this false reading. *Id.*; JA802-04. The district court granted summary judgment because the undisputed facts could not support this claim. JA2083–94.

    1.   <u>Summary of Relevant Facts</u>

    At the summary judgment stage, the undisputed record included the following:

    • In binding judicial admissions, CSX emphasized that its alleged reliance on Dr. Harron's reading of Baylor's x-ray was the predicate for the alleged fraud:

> Defendant Harron's actions are inherently fraudulent and part of the larger Baylor scheme to defraud CSXT. *In fact, without Harron's participation in the scheme there would have been no fraud.* It was Defendant Harron's fraudulent conduct in recklessly disregarding or deliberately misrepresenting Mr. Baylor's June 11, 2003 x-ray that allowed the fraudulent claim to be submitted to CSXT and prosecuted by the Peirce Firm.

JA802 (emphasis added).[4]

    • Because of the proceedings in *In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563 (S.D. Tex. 2005) involving Dr. Harron, the Peirce Firm did

---

[4] CSX asserts in its brief at pages 6–7 that the Peirce Firm began to use Dr. Harron because of his positive read rates, citing JA970–71. This assertion is unsupported. Mr. Raimond's deposition indicates that the Firm began using Dr. Harron because of his qualifications and because he could read large volumes of x-rays. JA963–64. CSX makes a similar assertion regarding Dr. Breyer at page 10 of its brief, citing JA1220. This citation does not support this assertion.

12

not file suit on behalf of Baylor until after his x-ray was re-read by Dr. Breyer as positive. JA1156, 1166–67, 129–131.[5]

• Dr. Breyer exercised his own independent judgment in reading the x-ray as positive. JA1188–89, 689–90. After reviewing Dr. Baylor's x-ray prior to his May 9, 2009 deposition, Dr. Breyer confirmed that opinion at his deposition. Doc. No. 536, Ex. 17.

• Dr. Breyer's B-reads have never been declared unacceptable by any of the asbestos bankruptcy trusts, nor has he been the subject of any disciplinary proceeding. JA1257.

• Dr. Breyer is not mentioned in the Amended Complaint even though his participation in re-reading x-rays for the Peirce Firm was discussed at Mr. Peirce's May 8, 2007 deposition (three months before the Amended Complaint was filed) and even though he was named in discovery responses served in September 2006 as having read Baylor's x-ray. JA129–31, 1261–66.

• CSX's expert admitted that the June 11, 2003 x-ray of Baylor was a readable x-ray. JA1099–1105.

• CSX's expert opined that it would not be inappropriate for a B-reader to read Baylor's x-ray as showing a 1/0 profusion, *i.e.* to read it as positive. JA1125.

• CSX itself has admitted that it does not dispute the "contention that a B-reader could hypothetically undertake to review the 2003 x-ray and believe in good faith that they find 1/0 profusion," *i.e.* reading the x-ray as positive. JA916.

2.    Additional Undisputed Record Evidence Related To Baylor's Condition

Asbestosis is a progressive disease. JA1036–37, 1044–45, 1107, 973. An individual who has been exposed to asbestos may not exhibit disease at a given point in time but, at a later point in time, may exhibit disease. JA1044, 973.

---

[5] The Peirce Firm stopped using Dr. Harron after the proceedings in the Southern District of Texas, when defendants in asbestos lawsuits refused to honor any reads performed by Dr. Harron. JA1166–67.

It is widely recognized that doctors who read x-rays for signs of asbestosis may have differing results based on the same x-ray of the same individual. JA1052–59, 1116–19, 1030–35. In this regard, the ILO Guidelines for interpreting x-rays for signs of asbestosis expressly acknowledge "variation between readers in their classifications of the same radiographs" (Doc. No. 536, Ex. 12 at 8 n.9) and recognize "that there is considerable variation in multiple readings of some radiographs, not only from reader to reader (inter-observer variation), but also between readings by the same reader (intra-observer variation)" (*id.* at 13). Such variability applies to other imaging modalities such as CT scans. JA1053–59, 1119. An individual can suffer from asbestos-related disease even if a CT is negative for such disease. JA991, 1046–47, 1145–47.

Before Baylor's suit was filed, three different National Institute for Occupational Safety and Health (NIOSH) certified B-readers (Drs. Harron, Breyer and Smith) all had read x-rays of Baylor as showing positive signs of asbestosis.[6] Dr. Smith gave his opinion for a different law firm and it was not related to any claim against CSX. JA770–71. Dr. Smith reviewed an x-ray that was taken over a year before the x-ray read by Dr. Breyer. *Id.*

---

[6] NIOSH has established a rigorous qualification, testing and certification procedure for B-readers. JA1111–13. There are only approximately 400 B-readers in the entire United States. JA1108–1110.

14

In 2005, Dr. Harron was criticized by a federal district court based upon his readings of x-rays for signs of silicosis (not asbestosis). *See In re Silica Prods. Liability Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005). Based in part on this proceeding and the publicity surrounding it, asbestos bankruptcy trusts began to refuse to accept claims based on Dr. Harron's readings, and CSX and other railroads began to refuse to settle claims based on Dr. Harron's readings. JA129–131, 1167. Accordingly, the Peirce Firm generally had x-rays previously read by Dr. Harron—including Baylor's June 11, 2003 x-ray—read by a different B-reader before filing suit based on them. JA1166–67, 129–131. Based on this new practice, followed in Baylor's case, prior to filing asbestosis claims, a new opinion from a different radiologist was to be obtained. *Id.*

As documents produced as part of CSX's own discovery responses indicated, various asbestos trusts and courts have recognized asbestosis claims as legitimate when, after a positive reading by Dr. Harron, a claimant subsequently obtained a new positive reading from a second doctor who has not been labeled unacceptable by the trust or the court. JA927–33. That—a B-read from a new doctor—is exactly what occurred here before Baylor's claim was filed. JA129–131, 1167.

In November 2003, Baylor's personal doctor requested a CT scan of his chest. Upon reviewing the CT scan of Baylor's lungs, a radiologist (Dr.

Christopher Knox) opined that he did not see any "obvious pleural calcification . . . to suggest prior asbestosis exposure" or interstitial lung disease. JA989. At his April 22, 2009 deposition, while adhering to his overall reading of the CT scan, Dr. Knox admitted that the CT scan contained evidence of what could be parenchymal scarring (scarring of the lung tissue) and admitted that this scarring could be caused by asbestos exposure. JA992–96, 998. CSX's own expert confirmed these conclusions. JA1130–38. Dr. Knox admitted that, because of this finding, he would amend the "Interpretation" section of his report to read: "Small amount of parenchymal scarring versus discoid atelectasis at the right lung base. Otherwise, unremarkable CT of the chest." JA997–98.

Baylor's CT report, along with a pulmonary function test consistent with asbestos-related disease, was submitted to the Peirce Firm in December 2003. JA1163. The pulmonary function test and report were scanned into the firm's electronic database by a paralegal as a single document with the pulmonary function test consisting of the first 3 pages of the document and the report the last page. JA928–931, 977, 1160–61. The records were coded in the system as "received GOOD dr. exam from client[']s doctor." Doc. No. 574, Ex. 7, Tab A.

*Neither Mr. Peirce nor Mr. Raimond (nor any other lawyer at the Peirce Firm) was aware of this CT report before CSX filed the Amended Complaint.* JA942, 975, 978, 981–82, 1162, 1168. As part of submitting the pulmonary

16

function test to various asbestos trusts related to claims against the trusts, the CT report was also turned over to the asbestos trusts. JA927–933, 979–80. In the underlying Baylor suit in state court, CSX moved to dismiss for lack of venue so the occasion to disclose the CT report in discovery never arose.

At pages 11 and 46–47 of its brief, CSX discusses an Asbestosis Questionnaire sent to Baylor by the Peirce Firm. CSX asserts that this Questionnaire was purportedly improperly altered. While the Peirce Firm disputes that this document was improperly altered, this Questionnaire was *not* provided to CSX as part of Baylor's case against CSX, and CSX does not contend otherwise. Additionally, there is no evidence that Mr. Peirce or Mr. Raimond ever saw that Questionnaire prior to discovery in this case, much less altered it or knew that it was altered—whether properly or improperly, and CSX cites no such evidence.

Evidence concerning exposure of railroad workers to asbestos is well known and was relied upon by the Peirce Firm in filing actions on behalf of clients. JA1157–58. Additionally, railroaders performing Baylor's job (trackman) were often exposed to asbestos, including through changing the asbestos brakes on their own equipment. JA1191–97. Baylor testified that he, in fact, changed the brakes on his track maintenance equipment. JA1207.

It was the practice of the Peirce Firm not to open a file for a railroad client unless, at the initial screening, he indicated a history of exposure to asbestos.

17

JA1158.  A file was opened for Baylor long before the above Questionnaire was filled out, as he attended his initial screening on June 11, 2003, and the Questionnaire is dated May 5, 2005.  JA95, 97, 1154.

### 3.  The Lawyer Defendants' Limited Involvement in Baylor's Claim

The Peirce Firm is not a Defendant in the claims related to Baylor.  Rather, they are filed against Mr. Peirce and Mr. Raimond (and Dr. Harron) as individuals.

Mr. Raimond retired from the Peirce Firm at the end of December 2003, over two years before the Baylor suit was filed.  JA960, 965.  At the time Baylor's x-ray was taken in June 2003, Mr. Raimond had a limited, if any, role in the Peirce Firm's screening process.  JA959–62, 966–67, 972.

While Mr. Peirce has overall responsibility for the Firm's asbestos practice, JA1149–50, as to the filing of Baylor's claim, Mr. Peirce did nothing more than oversee the filing of the complaint by other members of the Peirce Firm.  JA944–45, 1165.  Mr. Peirce did not actually review the complaint before it was filed.  JA952.

### 4.  CSX's Release from Liability Obtained from Baylor

On August 21, 2009, in advance of a scheduled trial on the Baylor-related claims, CSX listed on its pre-trial Rule 26(a)(3) Disclosures (*see* Doc. No. 734 at 7), the  Complaint and Dismissal Order in *Earl Baylor v. CSX Transportation, Inc*., Civil Action No. 01-C-3955, Kanawha County, West Virginia.   The Peirce

Defendants informed CSX that these documents—indeed, the very existence of this 2001 Kanawha County case—had not been disclosed in discovery. Doc. No. 762, Ex. C. Counsel for Defendants Peirce and Raimond immediately requested a copy of the Kanawha County complaint. *Id*., Ex. A.

CSX produced the Kanawha County complaint, which asserted that Baylor had been exposed to both asbestos dust and/or fibers and/or silica dust and that he "was caused to contract occupational pneumoconiosis including but not limited to asbestos and/or silicosis." JA73. After another request by counsel for Defendants (Doc. No. 762, Exhibit C), CSX produced a copy of a broad release it had obtained from Baylor covering, *inter alia*, asbestosis claims. As the Defendants asserted, the release had never previously been disclosed by CSX. *Id*. The release by Baylor was dated November 22, 2002, over three years before the filing of Baylor's claim by the Peirce Firm, and five years before the filing of the instant action by CSX. JA78–83.

D.   The District Court Properly Excluded Certain Impeachment Evidence at Trial of the May Fraud

CSX's claims with regard to the May fraud were tried in August 2009. CSX did not allege that Robert Peirce or the Peirce Firm directly participated in the May fraud. Rather, CSX's basis for liability against the Peirce Firm was vicarious liability based on the alleged conduct of an employee, Gilkison. JA1360. At trial, it became clear that CSX's theory that Gilkison was involved in the fraud stemmed

19

from an alleged conversation he had with May.  This conversation took place after a union meeting and while both May and Gilkison were drinking alcohol. JA1656–58. During this drinking, according to May, Gilkison made "an off the cuff statement, you might want to do this [have an impostor take an x-ray for you], get even with the guys that fired you."  JA1658.  May testified that he thought Gilkison might have been joking when he said this.  JA1657.

Other than this conversation, CSX presented no evidence that Gilkison was involved in the fraud.  JA1656–64. Gilkison denied being involved in the fraud in any manner, including denying having the above conversation.  May admitted that the fraud was not intended to and did not benefit Gilkison or the Peirce Firm in any manner.  JA1651.

CSX sought to cross-examine Mr. Peirce with documents that demonstrated that the Peirce Firm collected certain monies for May—unrelated to his asbestosis claim against CSX—after the fraud had come to light.  JA1438–1445, 1558–61.[7] Even though Mr. Peirce was not alleged to have been a participant in the fraud and even though Gilkison was not alleged to have been involved in any manner with these "third party" claims, CSX argued that this "third party" evidence was admissible, *inter alia*, to impeach Mr. Peirce.  JA1558–61.

---

[7]  The monies were later repaid.  JA2071–74.

Initially, CSX asked the district court to admit this evidence on a ratification theory related to punitive damages—but this was denied because the parties had stipulated to a bifurcated trial of damages. JA1438–45. Later, during the trial, CSX argued that this "third party" evidence was admissible to impeach Mr. Peirce. JA1558–61. The district court excluded this evidence under Federal Rules of Evidence 401, 403, and 404 stating the claims against third parties were not relevant to the alleged fraud against CSX and that the evidence was unfairly prejudicial and its admission would result in an unfair consumption of time and unfairly confuse the jury. JA1560–61, 1853.

To this Court, CSX argues that the district court erred because the "third party" evidence somehow could have impacted the jury's consideration of Gilkison's credibility and because the evidence "made it more likely that the fraud was a calculated scheme by Gilkison and the Peirce firm" to generate revenue. CSX Br. 59. CSX offered neither of these rationales to the district court. JA1438–45, 1558–61.

## SUMMARY OF ARGUMENT

A.   The District Court's Statute of Limitations Decision

First, as the district court noted, CSX has waived the argument that the district court erred by failing to apply a "separate accrual" rule. CSX failed to make such an argument at the motion to dismiss stage in a timely manner and

cannot demonstrate any exceptional circumstance excusing that failure. This Court should disregard CSX's belated arguments on the subject.

Second, the district court's decision was correct as a matter of law. This Court has adopted an injury discovery rule in RICO cases. Applying that rule to the face of CSX's Amended Complaint demonstrated that CSX had inquiry notice of its alleged injury (litigation costs in defending and settling cases) by at least 2002 and 2003, when it settled cases it now asserts were fraudulent, while having access to the x-rays and ILO forms that formed the bases of those claims.

Third, this Court should not adopt a separate accrual rule in RICO actions (a) because such a rule is contrary to the rationale of the Supreme Court's most recent RICO statute of limitations decision, *Rotella v. Wood*, 528 U.S. 549 (2000) and (b) because, given application of the injury discovery rule, the Court has already built in protection for a plaintiff with regard to the statute of limitations; this protection distinguishes the Clayton Act statute of limitations and the need for a separate accrual rule in that context where the statute begins to run strictly upon injury occurrence—not injury discovery.

Fourth, given the district court's subsequent summary judgment decision finding no fraud regarding Baylor's claim, adoption of the separate accrual rule here would not aid CSX. Based on the summary judgment ruling, CSX did not suffer an injury cognizable under RICO by the filing of Baylor's claim—therefore,

22

CSX is left with *no* injuries within the RICO statute of limitations and, as a result, no RICO cause of action.

Fifth, even if the Court determines that the district court's statute of limitations decision was erroneous, it should nonetheless affirm the dismissal on alternative grounds, including (a) the *Noerr-Pennington* doctrine, (b) CSX's access to the relevant information, which precludes a finding of fraud, and (c) CSX's failure to establish a pattern of racketeering activity.

B.    The District Court's Denial of Leave to Amend

The district court did not abuse its discretion in denying leave to amend. CSX failed to include the claims it sought to raise in the Second Amended Complaint in the Amended Complaint when it, by its own admission, had the information on which those claims were premised at the time it filed the Amended Complaint. This demonstrated a dilatory motive meriting denial of leave to amend. This is particularly true when CSX had demonstrated a pattern of serially moving to amend only after adverse decisions by the district court thwarted its broad attacks on the Peirce Firm and its lawyers. Additionally, leave to amend was properly denied as futile given the district court's statute of limitations decision and as prejudicial given the tremendous increase in the scope of discovery that would have resulted from the proposed amendment.

C.    <u>The District Court's Summary Judgment As to the Baylor Claims</u>

Based on CSX's own admissions and those of CSX's expert—that Baylor's x-ray was readable and that it could properly be read as positive—and the undisputed fact that Baylor's action was not filed until after Dr. Breyer read Baylor's x-ray as positive, the district court properly found that CSX could not prove its fraud allegations by clear and convincing evidence.  In the alternative, this Court should affirm the summary judgment order because (a) CSX's claims are defeated by CSX's prior release from Baylor, (b) CSX's claims are barred under *Noerr-Pennington*, (c) the lack of personal involvement by either Mr. Peirce or Mr. Raimond precludes a finding of fraud, and (d) reliance on Dr. Breyer's opinion precludes liability for Dr. Harron because it serves as a superseding, intervening cause.

D.    <u>The District Court's Exclusion of Impeachment Evidence</u>

The district court properly exercised its discretion in excluding claimed impeachment evidence at the trial of the May fraud under Rules 401, 403, and 404. CSX waived the arguments it makes here because it did not raise such theories of admissibility to the district court.  Moreover, the evidence was not related to claims against CSX and CSX desired to use it to impeach Mr. Peirce, who was not alleged to have been a participant in the fraud and the evidence did not relate to Gilkison.

## STANDARD OF REVIEW

Appellees concur with the standards of review set out by CSX at page 17 of its brief, with one exception. As to the district court's alleged failure to apply a separate accrual rule under the RICO statute of limitations and also with regard to CSX's arguments for admission of the impeachment evidence, because CSX did not timely raise these arguments in the lower court, its objections to these decisions are waived absent exceptional circumstances. *See Jones v. Liberty Mut. Ins. Co. (In re The Wallace & Gale Co.)*, 385 F.3d 820, 835 (4th Cir. 2004) (failure to raise argument before district court results in waiver on appeal, absent exceptional circumstances); *Bregman, Berbert & Schwartz, L.L.C. v. United States,* 145 F.3d 664, 670 n.8 (4th Cir. 1998) (same).

## ARGUMENT

A.   The District Court's Statute of Limitations Decision Was Appropriate and Should Be Upheld

1.   CSX Waived Any Argument Regarding the Separate Accrual Rule

When Defendants' motions to dismiss, including their statute of limitations arguments, were pending before the district court, CSX did not argue for or ask the district court to apply a separate accrual rule, which this Court has never adopted. Doc. No. 234 at 21–33, JA778–79. But here, CSX relies almost exclusively on application of a separate accrual rule. CSX's failure to timely raise this argument below, without any explanation justifying this failure, constitutes waiver. *See*

*Jones*, 385 F.3d at 835.  This fact, by itself, requires the district court's decision to be affirmed.

>    2.    The District Court Properly Found CSX's Claims Time-Barred Under the Injury Discovery Rule

The district court held that, because CSX had access to the x-rays and ILO forms of the claimants whose lawsuits it alleges were fraudulent and had *settled* three of those suits prior to July 5, 2003, CSX had inquiry notice of its injury. JA695–99.  As a matter of law, this notice started the running of RICO's four-year limitations period.  This decision was sound and should be affirmed.

Rather than directly address this decision, CSX, in this Court, attempts to recast the decision arguing that the district court "implicitly" applied the separate accrual rule, albeit incorrectly according to CSX.  CSX Br. at 22.  Further, despite the direct language of the district court's order holding that the claims are time-barred and only then discussing the pattern of racketeering activity required under RICO (JA699), CSX incorrectly characterizes the district court's statute of limitations decision as being dependent on its pattern of racketeering discussion. CSX Br. at 22.  The district court's ruling, on its face, was not so dependent: "Accordingly, because eight of the nine cases were filed prior to May 19, 2003, more than four years prior to the date the amended complaint was filed, Counts 1 and 2 are time-barred and must be dismissed"; "At the very least, on the face of the amended complaint, CSX knew or should have known it was injured prior to

26

settling three of the nine cases." JA699 & n.4. Simply, the district court applied the injury discovery rule long ago adopted by this Court. It did so correctly and its decision should be affirmed.

Actions for civil RICO, 18 U.S.C. § 1962(c), and RICO conspiracy, 18 U.S.C. § 1962(d), are governed by a uniform four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). The RICO statute of limitations begins to run not when a party fully understands the pattern of racketeering, its claim, or its total injury, but at "the point of injury or its reasonable discovery" when a party knows or is on inquiry notice of its initial injury. *Rotella v. Wood*, 528 U.S. 549, 558 (2000). As the Supreme Court held in *Rotella*, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Id*. at 555. Thus, a plaintiff's period of limitations begins to run when the plaintiff knew or should have known of its injury. Even prior to the Supreme Court's decision in *Rotella*, this Court consistently followed the "injury discovery rule" in civil RICO cases, stressing that the injury, and not the RICO cause of action, is the thing to be discovered. *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 539–40 (4th Cir. 1997); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir. 1987); *Cherrey v. Diaz*, 991 F.2d 787, 1993 WL 118099, at *2 (4th Cir. 1993) (unpublished table decision). Applying the precedent of the Supreme Court and this Court to the instant case, the district

court's decision finding CSX's civil RICO and RICO conspiracy claims to be time-barred should be affirmed.

As a matter of law, if a complaint's allegations "show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock,* 549 U.S. 199, 215 (2007); *see also Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995) ("[I]f a plaintiff pleads facts that show its suit is barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis."). This rule is applicable in civil RICO cases. *See Limestone Dev. Corp. v. Village of Lemont,* 520 F.3d 797, 802 (7th Cir. 2008).

Here, based on the allegations in the Amended Complaint, CSX's statute of limitations clock started in 2000, soon after the initial suit at issue was filed in March 2000 and CSX had the ability to obtain the underlying x-ray and ILO form. At the latest, as the district court found, "at the very least, on the face of the amended complaint, CSX knew or should have known it was injured prior to settling three of the nine cases [which were settled on August 1, 2002, November 17, 2002 and June 25, 2003, respectively]." JA699. Thus, the district court correctly concluded that, at least by 2002, CSX should have known of multiple alleged fraudulent claims comprising part of the RICO and RICO conspiracy counts. Rather than being in the dark about the bases for the allegedly fraudulent

28

claims, CSX had access to the information that they claim underlies their RICO and fraud claims—Dr. Harron's ILO forms (that disclose the bases for Dr. Harron's opinions including the severity of the injury found and the quality of the x-ray) and the x-rays themselves on which the claims are based. JA697–98.

That access certainly had been available by the time CSX entered its first two settlements in August and November 2002. At that point, if not sooner, CSX knew or should have known of its injury. *See Rotella,* 528 U.S. at 558. Certainly by the time CSX is entering into binding legal settlements, it, as a matter of law, can be charged with the obligation to evaluate the evidence underlying the claims. Therefore, the district court correctly found CSX's claims to be time-barred.

This legal conclusion is not altered by CSX's arguments asserting that it did not have access to the x-rays previously read by Dr. Harron as negative and the corresponding negative ILO forms. *See* CSX Br. at 26–27. Either the claims based on positive readings of certain x-rays are fraudulent or not based on what is shown on those x-rays; the screening process and any prior negative readings are irrelevant. If a claimant does have asbestosis, the disease is not rendered non-existent because it was discovered at a Peirce Firm screening or because of Mr. Corbitt's background or because of a prior negative reading of a different x-ray taken and read at a prior point in time by Dr. Harron. CSX's contention that its lack of knowledge about prior negative x-rays is pertinent to the statute of

29

limitations analysis is a red herring. The positive readings and ILO forms that formed the bases of the underlying suits—which CSX admittedly had access to—are what is important and provide inquiry notice; the other information is superfluous.[8]

To discover its alleged injury, CSX had to do nothing more than review the x-rays and ILO forms to find the same basis for CSX's current contention that the claimants did not have asbestosis and to determine that it was purportedly being injured by having to defend allegedly illegitimate claims. The date CSX discovered or should have discovered the alleged illegitimate nature of the claims (*i.e.,* CSX's claim that positive x-rays actually did not evidence asbestosis)—not discovery of the "process" by which the claims were initiated and filed—triggers the running of the statute of limitations. The prior negative x-rays (particularly in the case of a disease that progresses so that a person who was initially negative may later become positive) have no bearing on whether the later x-rays exhibit signs of the disease. Thus, as a matter of law, based on the admitted facts that CSX had access to these x-rays and ILO forms, no other conclusion can be reached than that CSX knew or, if they had exercised reasonable diligence, would have

---

[8] The views expressed in the amicus briefs of the American Tort Reform Association et al. and the West Virginia Chamber of Commerce regarding the "entrepreneurial model" and the lack of access to the negative x-rays are unpersuasive and irrelevant for these same reasons.

known of their injury caused by the alleged fraud (*i.e.*, the costs of defending and settling allegedly meritless claims) prior to July 5, 2003, four years before the filing of the Amended Complaint.

Certainly, if knowledge of a potential fraud based on newspaper articles or the existence of other lawsuits in an industry as a whole triggers the running of the statute of limitations, *see LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003), then having access to the very information on which a fraudulent claim is allegedly based—the x-rays and ILO forms themselves—and from which a determination could be made whether the claimant had or did not have asbestosis must trigger the running of the statute. *See id.* at 154 (holding that a single article "contribut[ed] to a duty of inquiry" and that the complaint was time-barred). CSX cannot deny—and in fact admits—that it had access to this information. That access gives CSX inquiry notice, as the district court properly found.

Moreover, CSX's own legal citations in the district court evidence a general knowledge in the industry of screening procedures such as those conducted by the Peirce Firm and alleged problems in asbestosis litigation, which knowledge certainly dates back prior to July 2003. *See* Doc. No. 234 at 3-5 (citing both *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233 (S.D.N.Y. 2001) and *Raymark Indus., Inc. v. Stemple*, No. 88-1014, 1990 WL 72588 (D. Kan. 1990)).

31

An amicus supporting CSX here, the American Tort Reform Association (ATRA), cites numerous articles from 2001, 2002, and 2003 showing a general awareness in the legal and corporate communities about the alleged problems in asbestos litigation. *See, e.g.,* ATRA Br. at 8 (citing David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation,* 31 Pepp. L. Rev. 11 (2003)), and 20 (citing Matthew Bergman & Jackson Schmidt, Op-Ed., *Change Rules on Asbestos Lawsuits,* Seattle Post-Intelligencer, May 30, 2002, at B7, *available at* 2002 WLNR 2149929; Susan Warren, *Competing Claims: As Asbestos Mess Spreads, Sickest See Payouts Shrink,* Wall St. J., Apr. 25, 2002, *abstract available at* 2002 WLNR 2320384). Thus, knowledge of mass screenings in general and the alleged ills associated with them also provided CSX with inquiry notice of any alleged fraud.[9]

Whether CSX lacked actual notice (because of its alleged failure to review the information or because of its objections to the state's mass tort procedures) does not impact the basis for the district court's *inquiry* notice finding. *See, e.g., GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007) (holding that

---

[9] This inquiry notice from general knowledge of screenings and asbestos litigation renders any criticism about West Virginia's mass litigation procedures and any claimed impact of those procedures on notice, such as the arguments raised by amicus the Washington Legal Foundation and the West Virginia Chamber of Commerce, moot. The general knowledge about screenings and asbestos litigation as evidenced by the citations of the amici that support CSX demonstrate a basis for inquiry notice that is in no manner impacted by the mass tort procedures.

a "profusion of information was sufficient, as a matter of law, to spur a reasonably diligent person to investigate," since "inquiry notice should not 'await the dawn of complete awareness.'") (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)). To hold otherwise would eliminate the concept of inquiry notice by imposing an actual notice requirement in RICO actions. That is not the law. As the Supreme Court has held, one of the intended purposes of civil RICO actions is to encourage "potential private plaintiffs diligently to investigate." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997); *see also Rotella*, 528 U.S. at 558 ("It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize."). CSX's conduct in attempting to bring this suit seven years after it discovered or should have discovered its injury defies this purpose. *See Mathews v. Kidder, Peabody & Co.,* 260 F.3d 239, 250-57 (3d Cir. 2001) (holding RICO claim time-barred since injury occurred at time of investment, "storm warnings" put investors on notice, yet they failed to exercise reasonable diligence); *Lanza v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. P'ships Litig.),* 154 F.3d 56, 60 (2d Cir. 1998) (holding RICO claim time-barred because plaintiffs were on "inquiry notice" of "fraudulent scheme").

Likewise, the district court properly held CSX's common law fraud claims (Count III), with the exception of the claim related to Baylor, and civil conspiracy

claims (Count IV) to be time-barred. The limitations period for these claims is two years. *See* W. Va. Code § 55-2-12. Similar to the standards governing CSX's RICO claims, West Virginia common law employs an injury discovery rule in assessing when the applicable statute of limitations beings to run, particularly in the context of an alleged fraud. *See Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002). "[I]nquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam." *Brumbaugh*, 985 F.2d at 162. The inquiry notice rationale on which the district court founded its RICO statute of limitations decision is equally applicable to CSX's common law claims. So is the inquiry notice as evidenced by the citations in ATRA's amicus brief. *See* ATRA Br. at 8, 20. Therefore, the district court's decision finding these claims time-barred should be affirmed.[10]

3.    This Court Should Not Adopt a Separate Accrual Rule

Despite having the opportunity to do so, this Court has not adopted a "separate accrual" rule. *See Cherrey*, 1993 WL 118099, at *3 n.3. Instead, this Court has consistently applied a strict injury discovery rule when addressing the RICO statute of limitations. *See, e.g., Pocahontas*, 828 F.2d at 220.

---

[10] Moreover, Dr. Harron's testimony in the silica litigation occurred on February 16, 2005. *See In re Silica Products*, 398 F. Supp. 2d at 603–08. This testimony was approximately 29 months before CSX filed the Amended Complaint, rendering the common law claims time-barred for this reason as well.

34

While CSX argues that the injury discovery rule applied by this Court and the separate accrual rule that it urges this Court to adopt are not "alternative" rules, but rather "components" of the same rule (CSX Br. at 23–24), that is not the Supreme Court's view. In the same case where the Court classified the Fourth Circuit as applying the injury discovery rule, *see Klehr*, 521 U.S. at 185-86, it also noted separately that "some Circuits have adopted a 'separate accrual' rule in civil RICO cases," *id.* at 190, but never suggested that the two approaches were components of the same rule. *See also* Jed S. Rakoff & Howard W. Goldstein, *RICO: Civil and Criminal Law* § 3.04 (2008) (recognizing that the Fourth Circuit applies injury discovery rule, as opposed to separate accrual rule). The separate accrual rule serves different purposes than the injury discovery rule applied by the district court and this Court; expands the statute of limitations in a broader manner than the injury discovery rule; and, moreover, is a rule that the Supreme Court has never approved. It simply is a different rule and a broader rule. CSX's wordsmithing cannot negate this fact. The Court should not adopt this new rule here, especially when CSX did not even present the issue in a timely manner to the district court below.

a.    A Separate Accrual Rule Is Contrary to RICO's Underlying Policies As Expressed in *Rotella*

Ironically, while urging this Court to adopt a rule that has yet to be adopted by the Supreme Court, CSX neglects to discuss in any detail the Supreme Court's

most recent case dealing with the RICO statute of limitations, *Rotella v. Wood,* 528 U.S. 549 (2000). But that case makes clear that the separate accrual rule urged by CSX is at odds with the Supreme Court's guidance.

As an initial matter, in *Rotella*, the Supreme Court discussed in great detail the legal concept of accrual under the statute of limitations. *See* 528 U.S. at 553–59. Nowhere in this six-page discussion does Justice Souter, writing for a unanimous Court, even mention the separate accrual rule. Certainly if that rule were favored by the Supreme Court, one would expect Justice Souter to at least have mentioned it. But the Supreme Court's only mention of the rule, in *Klehr*, was in dicta and the Supreme Court did not adopt the rule there or in *Rotella*.

In eliminating the "injury and pattern" discovery rule in *Rotella*, the Supreme Court made clear that the purpose of the RICO limitations period—repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities—would not be served by allowing plaintiffs to indefinitely extend the limitations period. *See* 528 U.S. at 555. The Supreme Court rejected statute of limitations rules that improperly "extend the potential limitations period for most civil RICO cases well beyond the time when a plaintiff's cause of action is complete." 528 U.S. at 558. The separate accrual rule urged by CSX would, contrary to the teachings of *Rotella*, so extend the RICO limitations period.

36

In *Rotella*, the Supreme Court emphasized RICO's "objective of encouraging *prompt* litigation to combat racketeering," *id*. at 557 n.3 (emphasis added), as well as RICO's purposes of encouraging potential private plaintiffs to investigate diligently and making them "private attorneys general" assigned to fulfill RICO's purpose of suppressing alleged racketeering activity "the sooner the better" by "rewarding the swift who undertake litigation in the public good." *Id.* at 557, 558, 559. A separate accrual rule whereby a plaintiff could still assert a RICO claim despite having inquiry notice of the alleged fraud seven years before the filing of its claim—as is the case here—runs totally counter to RICO's articulated goal, as emphasized by the Supreme Court in *Rotella*, of encouraging "private attorneys general" to swiftly "undertake litigation in the public good" in order to "prompt[ly] . . . combat racketeering." *Id.* Contrary to the Supreme Court's rationale in *Rotella*, a separate accrual rule would "have the effect of postponing whatever public benefit civil RICO might realize." *Id*. at 558.

CSX should not be permitted to assert a RICO claim when the first allegedly fraudulent suit comprising the alleged RICO conduct was filed in March 2000 and CSX had settled two cases by November 2002. What CSX did (or failed to do) is the antithesis of diligent investigation and is contrary to RICO's purpose of suppressing alleged racketeering activity "the sooner the better" through "prompt litigation." *Id*. CSX's arguments for application of a "separate accrual" rule

37

ignore these underlying principles upon which civil RICO is founded.[11]  Given these underlying principles as articulated by the Supreme Court in *Rotella*, this Court should deny CSX's invitation to adopt a separate accrual rule.

Simply put, when a plaintiff knows or should know he is injured—here in 2000 (or at the latest 2002)—the plaintiff should take action at that time to halt the conduct causing the injury, and such initial injury provides it heightened notice regarding further conduct by the alleged racketeer.  If a plaintiff fails to take appropriate action or take heed of this notice in a timely manner, its claims are time-barred.  *See DeShazo v. Nations Energy Co.*, 286 F. App'x. 110, 117 (5th Cir. 2008) (denying application of separate accrual rule "where a plaintiff already knows or should know of the fraud.").

CSX argues that seven sister circuit courts have applied separate accrual rule: the Second, Third, Fifth, Seventh, Ninth, Tenth and Eleventh.  *See* CSX Br. at 19–20.  However, with the exception of *Love v. National Medical Enterprises*, 230 F.3d 765 (5th Cir. 2000), every case cited by CSX in support of the "separate accrual" rule was handed down *before* and certainly without the benefit of the *Rotella* decision.

---

[11]   Assuming *arguendo* that they are not otherwise barred, common law fraud claims are still available as a remedy for alleged frauds as they occur after the statute of limitations has run on the RICO claim.  What does not remain cognizable is the right of "private attorneys general" to seek treble damages based upon a contention that a defendant is a corrupt organization and has engaged in a pattern of improper conduct.  528 U.S. at 558.

After *Rotella*, only the Fifth Circuit has reaffirmed or adopted the separate accrual rule. *See Love*, 230 F.3d at 773–75. And the Fifth Circuit has tempered its application of the separate accrual rule by subsequently holding that—in a case like the present one where a party was on inquiry notice of the fraud—the rule "does not apply where a plaintiff already knows or should know of the fraud." *DeShazo,* 286 F. App'x. at 117–18. The *DeShazo* decision effectively follows the same concept as this Circuit's injury discovery rule, which is consistent with the policies underlying RICO articulated by the Supreme Court in *Rotella*.

As the Fifth Circuit's holding in *DeShazo* demonstrates and contrary to the representations in CSX's Brief, post-*Rotella*, the landscape of what Circuits apply a separate accrual rule and the parameters of such a rule are anything but clear cut. Accordingly, given the policy rationales underlying the Supreme Court's decision in *Rotella*, this Court should not adopt a separate accrual rule and, instead, should continue to apply its traditional injury discovery rule. If the Court does adopt a separate accrual rule, it should limit that rule consistent with the Fifth Circuit's holding in *DeShazo*. Under either scenario, the district court's decision should be affirmed.

     b.   <u>RICO's Injury Discovery Rule Provides Protections That Make It Unnecessary to Adopt the Separate Accrual Model</u>

CSX's arguments by analogy to the Clayton Act do not alter the conclusion that this Court should not adopt a separate accrual rule. While the Supreme Court

has looked to the Clayton Act in helping to define RICO's statute of limitations, it has also expressly recognized "that the Clayton Act's express statute of limitations does not necessarily provide all the answers." *Klehr*, 521 U.S. at 193. The Supreme Court has further determined that a RICO cause of action is "simpler . . . than its Clayton Act counterpart," and, given this simplicity, found that "RICO's comparative simplicity in this respect surely does not support the adoption of a more protracted basic limitations period." *Rotella*, 528 U.S. at 560.

With regard to statutes of limitations, there is a fundamental difference in the Clayton Act model, as opposed to RICO, which warrants application of a separate accrual rule in the former but not the latter. Under the Clayton Act, a pure injury occurrence, as opposed to an injury discovery, rule governs. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Thus, the statute of limitations starts to run on the date of injury regardless of whether a party is aware of the injury at that time. Under such a strict injury occurrence rule, the possibility exists that a plaintiff's claim could become time-barred before he is aware of an injury. To help protect plaintiffs from the potentially harsh results that might flow from this pure injury occurrence rule, with regard to continuing violations, courts have applied a separate accrual rule in the antitrust context, allowing the limitations period for a given injury to start anew upon infliction of a new injury. *See id*.

40

No such protection provided by the separate accrual concept is needed under RICO, where this Court and the Supreme Court have applied an injury discovery rule. Unlike the potential harsh result in the Clayton Act context where a plaintiff's action could become time-barred even before it learns of its injury, under RICO, the limitations period does not begin to run until a plaintiff knows or should know of its injury. *See Rotella,* 528 U.S. at 558. Thus, unlike under the Clayton Act, a RICO plaintiff does not need the added protection of the separate accrual rule. *Cf. DeShazo,* 286 F. App'x at 117-18. Accordingly, given the fundamental difference between when the statute of limitations starts to run under RICO, as opposed to the Clayton Act, there is no need for this Court to adopt a separate accrual rule and it should decline CSX's belated invitation to adopt such a rule.

### 4. The Separate Accrual Rule Does Not Save CSX's RICO Claims

Even if the Court elects to adopt the separate accrual rule, the district court's decision must still be affirmed, because the only injury for which CSX could recover would be the non-time-barred claim related to Baylor. But the district court subsequently entered summary judgment finding no fraud related to Baylor and, for the reasons discussed below, that decision should be affirmed. Given that decision, CSX cannot prove any injury related to Baylor's claim and the claim, therefore, cannot support CSX's RICO claims. *See generally Hemi Group, LLC v.*

*City of New York,* 130 S. Ct. 983, 2010 WL 246151 (2010). Accordingly, dismissal of CSX's RICO claims should be affirmed regardless of whether or not the Court elects to adopt the separate accrual rule.

> 5. **Alternative Grounds Exist for Upholding the Dismissal of CSX's Claims**

On appeal, this Court has the power to affirm a decision of the district court on any ground appearing in the record. *See Toll Bros., Inc. v. Dryvit Sys., Inc*., 432 F.3d 564, 572 (4th Cir. 2005). Accordingly, even if the Court determines that CSX's claims were not time-barred, it nonetheless should uphold the district court's dismissal order for several reasons.

> a. Noerr-Pennington Doctrine

CSX's claims are barred by the *Noerr-Pennington* doctrine. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49 (1993), the Supreme Court held that *Noerr-Pennington* immunizes the filing of a lawsuit, regardless of the suit's purpose, so long as the litigation is not a "sham." *Id.* at 51. To be a "sham," a lawsuit must be objectively baseless and a suit is objectively baseless only if "no reasonable litigant could realistically expect success on the merits." *Id.* at 60*; see Igen Int'l, Inc. v. Roche Diagnostics*, 335 F.3d 303, 312 (4th Cir. 2003); *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2001). "A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *Professional Real Estate*, 508 U.S. at 61 n.5.

42

Thus, if the party filing suit has a reasonable belief that its claims may be successful, the suit is immunized under *Noerr-Pennington*.[12]  The application of *Noerr-Pennington* is a question of law.  *See Igen Int'l, Inc.*, 335 F.3d at 310.

The instant action falls under *Noerr-Pennington* as CSX's Amended Complaint sought to hold Defendants liable based on the Peirce Firm's filing of lawsuits on behalf of its clients.  *See Kearney v. Foley & Lardner, LLP,* 590 F.3d 638, 645 (9th Cir. 2009) (lawyers protected by *Noerr-Pennington*).  Further, without factual allegations in the Complaint establishing that no expert could reasonably find that the x-rays involved in the nine cases at issue show a 1/0 classification (absent here and, besides, CSX has admitted the opposite as to Baylor), CSX cannot demonstrate that no reasonable litigant could realistically expect success on the merits of the claims that were filed.  Indeed, CSX had already valued Baylor's asbestos-related claims enough to settle them once already.  Accordingly, the Amended Complaint is barred under *Noerr-Pennington* and the district court's dismissal should be upheld.

> b.    <u>CSX Had Access to the Information to Which the Alleged Fraud Is Based, Precluding a Finding of Fraud</u>

CSX's allegations are premised on the x-rays which were allegedly fraudulently read by Dr. Harron and then upon which the Peirce Firm allegedly

---

[12]Although the *Noerr-Pennington* doctrine arose in the antitrust context, courts, including this Court, have applied it more broadly, including in RICO actions.  *See Igen Int'l, Inc.*, 335 F.3d at 310.

knowingly brought suit.  JA153–59.  It must be remembered that this was personal injury litigation and CSX had the ability to—and an adversary usually would—access, examine, and test the other side's expert evidence.  Simply put, CSX had (or had the ability to obtain) these same x-rays, as well as the ILO forms for the claimants at issue, other medical information, and the ability to depose the claimants.  JA681–82.  CSX was not in the dark about the bases for these claims—as part of the underlying litigation, it had access to the most fundamental information on which the claims were based.

The fact that CSX had access to this information precludes CSX from asserting a RICO or fraud claim based on this information.  *See Capitol Chrysler-Plymouth, Inc. v. Megginson,* 532 S.E.2d 43, 47-48 (W. Va. 2000) (Where a plaintiff "'undertakes to inform himself from other sources as to matters easily ascertainable, by personal investigation, and the defendant has done nothing to prevent full inquiry, he will be deemed to have relied upon his own investigation and not upon the representations'" of the defendant.) (quoting *Cordial v. Ernst & Young*, 483 S.E.2d 248, 250 (W. Va. 1996)); *see also Rollison v. Washington Nat'l Ins. Co.*, 176 F.2d 364, 367 (4th Cir. 1949) (Va. law) (Where plaintiff alleged deliberate concealment of documents but "it was clearly within his power to demand their production and to inspect them," then "[h]is failure to take this ordinary business precaution" doomed any claim based "on the ground of

44

misrepresentation or of fraud.").  CSX cannot have been defrauded by information it had or had access to and which it had, or could have had, its own doctors review.

CSX is asserting that lawyers can be liable for civil RICO claims and common law fraud despite the fact that their adversary (CSX) could have obtained the very materials that form the basis for the Plaintiffs' expert opinions that are allegedly fraudulent and could have contested these materials and opinions in the underlying litigation.  Simply, CSX's claims stem from allegations relating to what has become one of the foundational pieces of evidence in nearly every personal injury action filed in our adversarial system—an expert opinion.  Imposing liability here would threaten to turn every claim based on an expert opinion into a fraud.  That is not a position that this Court should endorse.

c.     Failure to Demonstrate a Pattern of Racketeering Activity

In order to state a RICO claim, as a matter of law, CSX must demonstrate a "pattern of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985).  Whether a "pattern" exists must be judged on a case-by-case basis.  *HJ Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243 (1989).  CSX's own pleading precludes such a finding here.

The Amended Complaint and the Exhibits thereto refer to 4,743 claims filed by the Peirce Firm against CSX.  Of those claims, CSX alleged that only nine are fraudulent, amounting to less than 0.2% of the claims filed over a six-year period.

45

Thus, the Amended Complaint itself shows that the alleged fraud was at best rare and sporadic. "Sporadic" activity is the antithesis of a pattern of racketeering activity and such alleged sporadic activity does not come within the scope of RICO. *Sedima*, 473 U.S. at 496 n.14. Simply, a finding of alleged fraud in less than 0.2% of the claims filed by the Peirce Firm cannot support a RICO claim.

B.    <u>The District Court Acted Within Its Discretion in Denying CSX Leave to Amend to File Its Second Amended Complaint</u>

     1.    <u>The District Court Did Not Abuse Its Discretion in Finding That CSX Acted with a Dilatory Motive</u>

The district court properly found that CSX was knowingly dilatory in bringing its supposedly new claims, which were based upon information it had eight months before it filed the original Amended Complaint.

Rule 15 provides that leave to amend is to be freely given when justice so requires, but the right to amend is "by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (internal quotation marks omitted). Accordingly, it is "within the sound discretion of the district court whether to grant or deny a motion to amend." *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir. 1992). "This standard of review mandates a significant measure of appellate deference to the judgment calls of trial courts," *United States v. Pittman*, 209 F.3d 314, 316 (4th Cir. 2000), because the "trial court is generally in a better position to

make such a determination," *Chaudhry v. Gallerizzo*, 174 F.3d 394, 404 (4th Cir. 1999).

A district court may deny a motion to amend if the amendment evidences "undue delay, bad faith *or dilatory motive* on the part of the movant, *repeated failure to cure deficiencies by amendments previously allowed*, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added); *see also Sandcrest Outpatient Servs., P.A. v. Cumberland Cty. Hosp. Sys. Inc.*, 853 F.2d 1139, 1148 (4th Cir. 1988). Dilatory motive, which implies intent, and undue delay are two independent grounds for denial of a motion to amend. *See Foman*, 371 U.S. at 182.[13] "A motion to amend should be made as soon as the necessity for altering the pleading becomes apparent. A party who delays in seeking an amendment is acting contrary to the spirit of the rule . . . ." 6 Wright & Miller, Federal Practice and Procedure § 1488.

Here, CSX filed the Amended Complaint only after the majority of the claims in the original complaint were dismissed. Only then did it seek leave to file the Second Amended Complaint, after the district court dismissed the majority of the claims in the Amended Complaint. It sought such leave even though it had the

---

[13] While a denial of an amendment based on delay also requires a showing of prejudice, *see Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987), Appellees are unaware of any authority requiring such a showing with regard to a denial based on dilatory motive.

information underlying the proposed second amendment at the time it filed the Amended Complaint. *See* JA747, 769, 790. In fact, CSX admits that it had the relevant x-rays in November 2006, but argues to this Court that it "was unable to process and evaluate the hundreds of x-rays until after the district court's deadline for the amended complaint had passed." CSX Br. at 36. CSX made no such argument to the district court and the record contains no basis for this assertion. Doc. No. 278 at 6, Doc. No. 282 at 11–13. Failure to raise this contention at any time below constitutes a waiver. *See Jones*, 385 F.3d at 835. Moreover, it is not credible to contend that CSX, which had launched a major attack on the lawyers in the Peirce Firm, could not evaluate "hundreds of x-rays" in the *eight months* between November 2006 and when the Amended Complaint was filed.

Given CSX's serial amendments in this action, particularly when CSX had the supposedly new information when it filed the Amended Complaint, the district court was within its discretion in denying CSX's motion to amend based on a dilatory motive. Further, CSX's conduct demonstrates a "repeated failure to cure deficiencies by amendments previously allowed." *Foman,* 371 U.S. at 182*; see also Omni Outdoor Advertising Inc. v. Columbia Outdoor Advertising, Inc.*, 974 F.2d 502, 506 (4th Cir. 1992) (Rule 15 "does not afford plaintiffs a tool to engage in the litigation of cases one theory at a time.").

48

2.    <u>Leave to Amend Was Properly Denied As Futile</u>

An amendment is futile under Rule 15 if the claims stated in the amendment are time-barred.  *See Keller v. Prince George's County*, 923 F.2d 30, 33 (4th Cir. 1991).  For the reasons discussed above, the district court properly found CSX's claims to be time-barred and this Court should affirm that decision.  Accordingly, CSX's motion to amend was futile.  Further, for any common law claims based on asbestosis suits filed at the same time as or subsequent to Baylor's, the record evidence establishes that it was the Peirce Firm's general practice to send x-rays read by Dr. Harron for a re-reading—demonstrating good faith and precluding a finding of fraud.  Accordingly, any such claims would be futile for this additional reason.

3.    <u>Leave to Amend Was Properly Denied As Prejudicial</u>

The district court also found that CSX's proposed amendment would result in prejudice to the Defendants because it would expand discovery.  JA793–94. This ruling was also within the district court's discretion.  Discovery on the Baylor fraud alone—the sole non-time-barred claim—took over six months.  CSX's proposed amendment would have increased discovery at least seven-fold for a case that had already been pending for three years.  Accordingly, leave to amend was properly denied for this reason as well.

C.     Based on CSX's Own Admissions, the District Court Properly Entered
       Summary Judgment on the Baylor Claims

If Baylor's x-ray could properly be read as evidencing signs of asbestosis,
then a good faith basis for the filing of his lawsuit existed and no fraud could have
occurred in filing his suit.  This is true regardless of how the x-ray was taken, who
took it, or who read it.  CSX admitted that it does not dispute the "contention that a
B-reader could hypothetically undertake to review the 2003 x-ray and believe in
good faith that they find 1/0 profusion."  JA916.  CSX's own expert, Dr. Cooper,
opined that it would not be inappropriate for a B-reader to read Baylor's x-ray as
showing a 1/0 profusion, *i.e.* read it as positive.  JA1125.  Given these admissions,
and the undisputed fact that suit was not filed until after Dr. Breyer read Baylor's
x-ray as positive, the district court properly entered summary judgment.[14]

In ruling on a summary judgment motion, the trial judge serves as a
gatekeeper.  This gatekeeper role is particularly salient in a case such as the instant
one, where CSX must prove fraud by Mr. Peirce, Mr. Raimond and Dr. Harron, as
individuals, by clear and convincing evidence.  *See Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242,  252 (1986) ("[T]he inquiry involved in a ruling on a motion for

---

[14] CSX's admissions concerning the readability of the x-ray and that it could be
reasonably read as positive for signs of asbestosis render irrelevant the arguments
raised by Dr. Franzblau et al. and the American Society of Radiological
Technologists et al. in their amicus briefs, which arguments criticize the process
relating to the taking and reading of Mr. Baylor's x-ray and reference
epidemiological studies but do not address the undisputed fact that this specific x-
ray was readable and could reasonably be read as positive.

50

summary judgment . . . necessarily implicates the substantive evidentiary standard of proof . . . ."); *JKC Holding Co. v. Washington Sports Ventures, Inc.,* 264 F.3d 459, 469 (4th Cir. 2001) (noting that clear and convincing standard must be applied at summary judgment stage).  It is the trial court's obligation to look at the record and determine whether sufficient evidence exists from which a jury could find fraud, including fraudulent intent and reliance, by clear and convincing evidence. If sufficient evidence does not exist, summary judgment must be entered.  *See White v. National Steel Corp.,* 938 F.2d 474, 490 (4th Cir. 1991).

### 1.    Summary Judgment Was Proper Based on the Undisputed Record

The district court held that summary judgment was required for two independent reasons.  First, as CSX's own judicial admissions demonstrated, the allegedly fraudulent misrepresentation that CSX claimed to have relied on was a representation that a good faith basis existed for Baylor's claim based on an x-ray reading of Dr. Harron.  JA2091.  Because Baylor's action was not filed until after Dr. Breyer read Baylor's x-ray, the district court properly held that the alleged misrepresentation that CSX claimed had harmed it, as a matter of undisputed fact, was not made.  JA2091–92.  Second, given CSX's admissions that the x-ray could reasonably be read as positive, coupled with, *inter alia*, Dr. Breyer's reading, the district court held that the record evidence could not establish that Defendants knew that Baylor did not have asbestosis—*i.e.* CSX failed to put forth evidence

sufficient for a jury to find, by clear and convincing evidence, the lack of a good faith basis for filing Baylor's claim. JA2092–93.

### a.   No Fraudulent Misrepresentation As Alleged by CSX Occurred

CSX alleged a fraud whereby Robert Peirce and Louis Raimond, as individuals, knowingly (or recklessly) submitted a purportedly false asbestosis claim on behalf of Baylor founded on a false x-ray reading performed by Dr. Harron. JA153–59. As CSX has admitted, in its own pleadings in the district court, an x-ray reading by Dr. Harron that served as the basis for Baylor's lawsuit was central to and a required part of the alleged fraud:

> Defendant Harron's actions are inherently fraudulent and part of the larger Baylor scheme to defraud CSXT. *In fact, without Harron's participation in the scheme there would have been no fraud*. It was Defendant Harron's fraudulent conduct in recklessly disregarding or deliberately misrepresenting Mr. Baylor's June 11, 2003 x-ray that allowed the fraudulent claim to be submitted to CSXT and prosecuted by the Peirce Firm.

JA802 (emphasis added). This judicial admission is binding on CSX. *See Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264–65 (4th Cir. 2004).

The claimed fraudulent scheme and related representation on which CSX founded its lawsuit—*i.e.* an allegedly false assertion of a good faith basis for Baylor's claim based on Dr. Harron's B-Read—simply did not occur as to Baylor's claim. Rather than bringing Baylor's claim based on Dr. Harron's B-Read, the Peirce Firm indisputably had a second doctor read Baylor's x-ray before it filed

52

suit.    JA129–131, 1167.[15]    Accordingly, the district court properly entered summary judgment.[16]

> ### b.    The Undisputed Record Established That a Good Faith Basis Existed for Filing Baylor's Claim Precluding a Finding of Fraudulent Intent

The district court's decision that the undisputed record also established that CSX could not prove fraudulent intent as to Mr. Peirce or Mr. Raimond is also well founded and should be affirmed.[17]    Mr. Peirce and Mr. Raimond as individuals (and not the firm) were sued regarding the Baylor claim.    To survive summary judgment, CSX had to present the district court with sufficient evidence to demonstrate that it could prove by clear and convincing evidence that Mr. Peirce and Mr. Raimond, as individuals—as opposed to some sort of collective knowledge of the Peirce Firm as a whole—acted with the requisite fraudulent

---

[15] That Dr. Breyer had re-read Baylor's x-ray was disclosed to CSX in discovery months before the Amended Complaint was filed. JA129–131, 1261–66.  Yet Dr. Breyer is not mentioned in the Amended Complaint.  At pages 48–49 of its brief, CSX asserts that Dr. Breyer's involvement was not divulged until after discovery on the Baylor claims began.  The record is contrary to this assertion.

[16] The history of Dr. Harron's B-readings of Baylor's x-rays also lacks any evidence of fraud:  Dr. Harron read an August 4, 1999 x-ray as negative; Dr. Harron then read a May 23, 2002 x-ray as "unreadable"; and Dr. Harron then read a June 11, 2003 x-ray as positive—which reading, consistent with a progressive disease, was confirmed by the subsequent reading of Dr. Breyer and CSX's own admissions.

[17] Mr. Raimond was not even with the Peirce Firm when the Complaint was filed. *See infra* at 62-63.  Similarly, Mr. Peirce had very limited direct involvement with the filing of Baylor's claim.  *See infra* at 62.

intent concerning Baylor's claim, as well as the other required elements of fraud including a false representation and reliance. *Miller v. Huntington & Ohio Bridge Co.*, 15 S.E.2d 687, 695 (W. Va. 1941) (Actual fraud "consists in deception, intentionally practiced, to induce another to part with property.") (internal quotation marks omitted).  Based on the material facts of record, CSX failed to meet its burden.

The issue here, as CSX admits at page 50 of its brief, is the question whether Baylor's claim was fraudulent because no good faith basis for filing it existed.  The evidence related to Baylor, which the district court properly analyzed, supports summary judgment regardless of CSX and the amici's contentions concerning the process by which the evidence was developed, or how many other claims were filed against CSX, or what Mr. Corbitt's criminal history is, or what Dr. Harron's overall read rate was, or what the claimed prevalence of asbestosis in railroad workers is.  These are extraneous issues not related to the evidence about Baylor.

Rather than evidencing fraud, the opinion CSX claims to be fraudulent (Dr. Harron's B-read) could, in fact, be correct, since CSX admitted that "a B-reader could hypothetically undertake to review the 2003 x-ray and believe in good faith that they find 1/0 profusion."  JA916.  CSX's own expert made a similar

admission.  JA1125.[18]  Thus, there simply cannot be proof of fraud here regarding Baylor's claim because, *inter alia*, no false, let alone knowingly false, representation was made.

It does not matter: (a) what Dr. Harron's read rate generally was; (b) what Dr. Breyer's read rate generally was; (c) what the read rate was for doctors who normally testify for plaintiffs; (d) what the read rate was of those who normally testify for defendants; (e) who took Baylor's x-ray; (f) or what the general prevalence of asbestosis in railroad workers is.  It *does* matter, as the district court recognized, that CSX's expert and own answers to interrogatories admit that Baylor's x-ray could in good faith be read as positive and that CSX's expert, likewise, admits that the x-ray in question was a readable x-ray.[19]

Given these admissions, CSX is driven first to the nonsensical position of arguing that even if Baylor's x-ray is positive, his suit was *per se* fraudulent just because Dr. Harron read Baylor's x-ray.  Then CSX is forced to further contend

---

[18]  At page 42 of its brief, without any record citation and ignoring its own admissions, CSX contends that the condition of Baylor's lungs was unchanged in the four years since his first negative x-ray in 1999.  While CSX made such a bald allegation in the Amended Complaint, the summary judgment record, including CSX's own admissions, disproved this allegation.

[19] The arguments raised in the amicus briefs of ATRA, Dr. Franzblau et al., and the American Society of Radiologic Technologists, which criticize the screening process used by the Peirce Firm and, *inter alia*, the quality of x-rays that can result from such a screening process, are irrelevant to Mr. Baylor's claim because CSX and its expert have both admitted that *this* x-ray is readable and could be properly read as positive.  JA916, 1099–1105, 1125.

that Baylor's suit was still a fraud even though another doctor (Breyer) did in fact read the x-ray as positive before Baylor's suit was filed. These arguments are specious on their face because CSX has admitted the actual Baylor x-ray could properly be read as positive.

Additionally, the district court properly found that, because the Peirce Firm sought a second medical opinion that Baylor's x-ray evidenced signs of asbestosis prior to filing suit on behalf of Baylor, a finding of fraudulent intent on behalf of Mr. Peirce and Mr. Raimond could not be made. At a minimum, filing suit only after obtaining this new opinion creates a set of circumstances that "are equally consistent with honest intentions." *White*, 938 F.2d at 490 (internal quotation marks omitted). In such a situation, as this Court held on summary judgment in *White*, a finding of fraud is precluded. *Id.*

CSX made no evidentiary showing indicating how, in light of Dr. Breyer's opinion, Mr. Peirce and Mr. Raimond allegedly knew that no good faith basis existed for Baylor's claim.[20] Of course, the existence of the disease was obviously

---

[20] CSX, in conclusory fashion, contends that Dr. Breyer's B-read was not "independent" because he had a copy of Dr. Harron's ILO form. CSX Br. at 43. CSX ignores Dr. Breyer's unrebutted deposition testimony on this point. Dr. Breyer testified that he did not reference Dr. Harron's ILO as to his asbestosis related findings and that Dr. Harron's ILO form did not impact his findings as to opacities and profusion rating—the parts of the ILO form that concern pneumoconiosis findings. JA689–90, 1188–89 (indicating Dr. Breyer would review the x-ray film and reach his conclusions regarding opacities and profusion

56

the ultimate disputed issue central to the underlying tort claim of Baylor. But the civil justice system is designed to have disputed issues resolved through an adversarial process by which each side presents its position. A party is not required to disregard its expert's opinion simply because that opinion may be disputed by the opponent or others or even if there are conflicts in the medical evidence. In the litigation setting, an opinion, whether by a defense expert or a plaintiff expert, is not a representation of absoluteness and, therefore, not a basis for liability. *See Scheduled Airlines Traffic Offices, Inc. v. Objective Inc.*, 180 F.3d 583, 589 (4th Cir. 1999) ("[E]xpressions of opinion . . . , as a matter of law, cannot form the basis for fraud.").

Moreover, as CSX itself asserts in its brief at page 39, a good faith basis for filing a claim exists if: (1) a positive x-ray consistent with asbestosis exists, (2) evidence of occupational exposure exists, and (3) a sufficient latency period has elapsed. The undisputed record established each of these three criteria as to Baylor.

---

level before ever looking at Dr. Harron's ILO form). CSX's own expert has testified that this type of review would not be inappropriate. JA1120–24.

57

First, as to a positive x-ray, CSX's own admissions and Dr. Breyer's reading clearly establish that the Peirce Firm had sufficient medical evidence to file the claim based on the criteria set forth in CSX's Brief.[21]

Second, the record established an exposure history on which Baylor's claim was founded—a history independent from the Questionnaire discussed by CSX at pages 46–47 of its brief, which Questionnaire was not provided to CSX in the underlying state court litigation. Railroaders performing Baylor's job (trackman) were often exposed to asbestos, including through changing the asbestos brakes on their own equipment. JA1191–97. Baylor testified that he, in fact, changed the brakes on his track maintenance equipment. JA1207. The uncontradicted deposition testimony of Mr. Robert Daley, the attorney who filed Baylor's claim, established that (1) the Firm was aware of a general work history that would have exposed Baylor to asbestos, as well as (2) an appropriate latency period. JA1157–

---

[21] Baylor's CT scan does not alter this undisputed record. Most importantly, *the undisputed record established that neither Mr. Peirce nor Mr. Raimond—the individuals who have been sued for fraud as individuals—was aware of the CT scan at the time Baylor's claim against CSX was filed.* JA97, JA942, JA1162. At summary judgment, CSX was required to come forward with evidence to the contrary about the individuals they sued. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Despite taking numerous depositions and having access to the relevant sections of the Firm's electronic files, CSX failed to produce *any* such evidence. Moreover, the doctor who read this CT scan has now admitted that the CT scan contained evidence of what could be parenchymal scarring (scarring of the lung tissue) and admitted that this scarring could be caused by asbestos exposure. JA992–96, 998. CSX's expert confirms these conclusions. JA1130–38.

59, 1191–97.[22]  Furthermore, it was the practice of the Peirce Firm not to open a file for a railroad client unless, at the initial x-ray screening, he indicated a history of exposure to asbestos.  JA1157-59.  A file was opened for Baylor long before the above Questionnaire was filled out, as he attended the initial screening on June 11, 2003, and the Questionnaire referenced by CSX is dated May 5, 2005.  JA95, 97, 1154.  The information that the Peirce Firm was aware of provided a proper basis for the claim and was the common basis on which such claims were typically filed.  JA1309.

Importantly, while the Peirce Firm disagrees that the Questionnaire is a fabrication of exposure, in this fraud action against Mr. Peirce and Mr. Raimond as individuals the Questionnaire is irrelevant for several reasons.  *First, there is no record evidence that Mr. Peirce or Mr. Raimond ever saw the Questionnaire prior to the discovery process in this case, much less altered it or knew that it was altered—whether properly or improperly.*  Again, this is a fraud case against Mr. Peirce and Mr. Raimond as individuals, not against the Peirce Firm.  It is imperative the document allegedly evidencing fraud be linked to the individual defendants, but that is not the case here.  Second, it is undisputed that the Questionnaire was *not* provided to CSX as part of Baylor's case against CSX.  A

---

[22]  CSX has not argued that an appropriate latency period did not exist.

document that was *not* provided to CSX obviously cannot be a basis for a fraud claim.

2.     Alternative Grounds Exist for Granting Summary Judgment

a.     CSX's Release from Baylor Precludes Fraud

On August 28, 2009, long after the close of discovery, CSX disclosed that CSX had entered a settlement with Baylor in which they paid him $7,500 and obtained a release that included his asbestosis and silicosis claims.  Doc. No. 734 at 7.  That release was dated November 22, 2002, over three years before the filing by the Peirce Firm of the complaint in Harrison County, West Virginia, in February 2006, and five years before the filing of this action.  JA78-83.  Thus, CSX knew *from the time that the Peirce Firm filed its case on behalf of Baylor* that it had a release from Baylor releasing the very asbestosis claim that the Peirce Firm was asserting.  CSX also knew when it filed the Amended Complaint in this case, asserting that it had been damaged by its reliance upon representations of the Peirce Firm, that it already had a release from Baylor which covered the claims asserted by the Peirce Firm in state court.

CSX never told the Defendants or the district court about the release and allowed this action to proceed for over two years on the premise that it had been misled and damaged somehow by the filing of an action on behalf of Baylor, when

CSX knew (although Defendants did not know) that the claim asserted on behalf of Baylor was already subject to a release.

It is essential for an actionable claim of fraud that there was a reasonable reliance by the plaintiff in acting on an alleged misrepresentation and damages stemming from that reliance. *See Lengyel v. Lint*, 280 S.E.2d 66, 69 (W. Va. 1981) (listing elements of fraud). Given the release, CSX cannot, as a matter of law and undisputed fact, prove either reasonable reliance or damages as CSX had already protected itself against further liability from Baylor's asbestosis claim.

Because CSX had a release of Baylor's asbestos exposure claim, it could not have reasonably relied on or incurred damages in defense of a claim that it knew had been released. The district court's entry of summary judgment should, therefore, be affirmed for this alternative reason.

### b.    Noerr-Pennington

The district court's summary judgment can also be affirmed on the alternative ground that CSX's claims are precluded by *Noerr-Pennington*. *See supra* at 42-43. CSX seeks to hold Mr. Peirce and Mr. Raimond liable for fraud and civil conspiracy based on the Peirce Firm's filing of a lawsuit on behalf of Baylor. That is precisely the type of conduct that *Noerr-Pennington* protects, particularly in light of CSX's admissions discussed above.

c.    The Lack of Personal Involvement by Mr. Raimond and Mr. Peirce in the Filing of Baylor's Claim Precludes a Finding of Personal Liability for Fraud

It must be remembered that the Peirce Firm is not a defendant related to the fraud allegations concerning the filing of Baylor's claim against CSX; Mr. Peirce and Mr. Raimond were sued as individuals.  Thus, it is the evidence—or more appropriately, the lack thereof—showing these individuals acted fraudulently in regard to the filing of Baylor's claim that is before the Court, not the cumulative or collective conduct or knowledge of the Peirce Firm.  CSX failed to come forward with any evidence demonstrating a fraud by these individuals, let alone the clear and convincing evidence required.

The record evidence shows that, as to the filing of Baylor's claim, Mr. Peirce did nothing more than oversee the filing of the state court complaint by other members of the Peirce Firm.  JA1162, 944–45.  Mr. Peirce did not actually review the complaint before it was filed.  JA952.  While Mr. Peirce has overall responsibility for the Firm's asbestos practice (JA1149–50), such responsibility does not make him, as an individual, liable for fraud if he himself committed no fraudulent acts.  The undisputed record here is devoid of any such fraudulent acts by Mr. Peirce.

The same is true for Mr. Raimond.  Mr. Raimond retired from the Peirce Firm in December 2003, over two years prior to Baylor's claim against CSX being

filed in February 2006. Yet CSX claims that Mr. Raimond is still liable for conspiracy related to Baylor's claim (Count 4). This claim must fail.

It is axiomatic that had the personal injury lawsuit never been filed on behalf of Baylor, CSX would have no claim it was allegedly defrauded by the suit. It is undisputed that Mr. Raimond was no longer with the Firm when the suit was filed. Further, Mr. Raimond's retirement from the Firm in 2003 would constitute a withdrawal from any alleged conspiracy. *See United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (closing of bank account constituted withdrawal); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 463–65 (1978) (instruction unnecessarily limiting the type of actions that may constitute withdrawal is reversible error). If, as in *Nerlinger*, the closing of a bank account is sufficient to constitute a withdrawal, *see* 862 F.2d at 974, then clearly Mr. Raimond's retirement from the Firm is a withdrawal.

### d.     Dr. Breyer's Opinion Precludes Liability for Dr. Harron

It is undisputed that Baylor's claim was not filed until after Dr. Breyer's positive B-Read and would not have been filed but for this positive read. JA1156, 1166–67, 129–31. Accordingly, any alleged fraudulent conduct by Dr. Harron could not have caused any injury to CSX as reliance on Dr. Breyer's B-Read in filing Baylor's claim was a superseding intervening cause of any alleged injury to CSX. Therefore, no alleged damages can flow from any claimed improper conduct

of Dr. Harron.  *See Yourtee v. Hubbard,* 474 S.E.2d 613, 620-21 (W. Va. 1996);

*Molinary v. Powell Mountain Coal Co.,* 125 F.3d 231, 237-38 (4th Cir. 1997).

Summary judgment is appropriate as to Dr. Harron for this independent reason.

D.    The District Court Properly Exercised Its Discretion in Refusing to Admit, at the Trial of the May Fraud, Certain Evidence Unrelated to Any Alleged Fraud Against CSX

At the trial of the May fraud, as purported impeachment evidence of Mr.

Peirce, CSX sought to admit evidence that the Peirce Firm had collected monies on

behalf of May for "third party" claims unrelated to May's fraudulent claim against

CSX.[23]  Mr. Peirce was not alleged to have been a participant in the May fraud and

it was not disputed that May had in fact committed the fraud.  Further, there were

no allegations that Mr. Gilkison had any role with regard to these "third party"

claims.

The only issues before the jury were whether or not Mr. Gilkison

participated in the fraud and, if so, whether the Peirce Firm could be held

vicariously liable for his participation.  Evidence of the "third party" claims had no

bearing on either of these issues and, therefore, its only purpose would have been

to unfairly prejudice the jury. The district court was keenly aware of this and

excluded this evidence under Rules 401, 403, and 404.  That decision was not an

abuse of discretion.

---

[23]  The district court did allow testimony about a carpal tunnel case that the Peirce Firm brought on behalf of May against CSX.  JA1561–65.

The trial court has broad discretion to admit or exclude evidence, including under Rule 403.  *See United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990). This Court "will not upset such a decision except under the most extraordinary of circumstances, where that discretion has been plainly abused."  *Id.* (internal quotation marks omitted).  In addition to demonstrating error related to exclusion of evidence, a party must also demonstrate prejudice.  *United States v. Tindle*, 808 F.2d 319, 327 n.7 (4th Cir. 1986).

Initially, the bases on which CSX now claims this evidence was admissible—that it somehow could have impacted the jury's consideration of Gilkison's credibility and because the evidence "made it more likely that the fraud was a calculated scheme by Gilkison and the Peirce firm" to generate revenue (CSX Br. at 59)—were not argued to the district court and, therefore, were waived. *See Jones*, 385 F.3d at 835.

Regardless of any waiver, because, *inter alia*, the evidence did not relate to claims against CSX, because Mr. Peirce's credibility was unrelated to the critical issues before the jury (*i.e.,* what was Mr. Gilkison's intent and involvement, if any, in the May fraud), and because the evidence did not involve Mr. Gilkison, the district court was well within its discretion in excluding it and its decision should be affirmed.  *See United States v. MacDonald*, 688 F.2d 224, 234 (4th Cir. 1982) ("[T]here is a significant danger of prejudice where evidence is adduced for

65

impeachment purposes that could not be presented directly on the merits of the case.").

Lastly, given the trial testimony by May about Gilkison's lack of any role in the fraud, *see supra* at 19-20, and the fact that CSX was permitted to cross-examine Mr. Peirce about the Firm's apparent continued representation of May on a carpal tunnel case after the May fraud came to light, any error in refusing to admit this "third party" evidence was harmless. *See Tindle*, 808 F.2d at 327 n.7; Fed. R. Evid. 103.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the district court's decisions challenged by CSX was proper and each of them should be affirmed.

Respectfully submitted,

 /s/ Walter P. DeForest
Walter P. DeForest                    Robert A. Lockhart
David J. Berardinelli                 SCHUDA & ASSOCIATES, PLLC
Matthew S. McHale                     P. O. Box 3425
DEFOREST KOSCELNIK YOKITIS KAPLAN      232 Capitol Street, 2nd Fl.
& BERARDINELLI                        Charleston, WV  25335-3425
436 Seventh Ave., 30th Fl.            304-343-8928
Pittsburgh, PA 15219
412-227-3100

*Counsel for Defendants-Appellees*
*Peirce, Raimond & Coulter, PC; Robert N. Peirce, Jr.; Louis A. Raimond; and*
*Mark T. Coulter*

66

Stanley Greenfield
GREENFIELD AND KRAUT
1040 Fifth Avenue
Pittsburgh, PA  15219
412-261-4466

*Counsel for Defendant-Appellee Robert
V. Gilkison*

Jerald Elton Jones
WEST AND JONES
360 Washington Ave.
P. O. Box 2348
304-624-5501

*Counsel for Defendant-Appellee Dr.
Ray A. Harron*

## REQUEST FOR ORAL ARGUMENT

Appellees respectfully request oral argument. This is an appeal of numerous decisions by the district court made over several years, including at a full trial. This Court is also being asked to rule on a significant issue for the first time, as CSX is urging this Court to adopt a new standard for the RICO statute of limitations. Oral argument will help to clarify the issues and respond to any questions the Court may have.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 09-2135     **Caption:** CSX Transportation, Inc. v. Robert Gilkison, et al.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 8,250 words or 650 lines; line count may be used only with monospaced type]*

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's Order, because:

    ☒☐this brief contains 16,412 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); *or*

    ☐☐this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒☐this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font; *or*

    ☐☐this brief has been prepared in a monospaced typeface using _____ [*state name and version of word processing program*] with _____ [*state number of characters per inch and name of type style*].

DeFOREST KOSCELNIK YOKITIS
KAPLAN & BERARDINELLI

Dated:  March 12, 2010                    s/ Walter P. DeForest
                                         Walter P. DeForest
                                         David J. Berardinelli
                                         Matthew S. McHale
                                         Koppers Building, 30th Floor
                                         436 Seventh Avenue
                                         Pittsburgh, PA  15219
                                         Phone:  412-227-3100
                                         Fax:      412-227-3130

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2010, a true copy of the foregoing Brief of Defendants-Appellees was filed with the Court Clerk through the CM/ECF system, which will send notice of such filing to the following counsel, all registered CM/ECF users.

Mark A. Behrens
Cary Silverman
SHOOK, HARDY & BACON LLP
1155 F. Street NW, Suite 200
Washington, DC  20004

*Counsel for Amici Curiae*
*American Tort Reform Association,*
*National Association of Manufacturers,*
*Coalition for Litigation Justice, Inc.,*
*Property Casualty Insurers Association*
*of America and Association of American*
*Railroads*

Scott L. Winkelman
Michael L. Martinez
Robert L. Wilmore
Jennifer G. Knight
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595

*Counsel for Amicus Curiae*
*West Virginia Chamber of*
*Commerce*

David P. Goch
Heidi K. Abegg
WEBSTER CHAMBERLAIN & BEAN
1747 Pennsylvania Avenue, N.W.
Washington, DC  20006

*Counsel for Amici Curiae*
*American Society of Radiologic*
*Technologists and the Virginia Society of*
*Radiologic Technologists*

Ashley C. Parrish
Candice Chiu
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006

*Counsel for Amicus Curiae*
*American Society of Radiologic*
*Technologists*

71

David Craig Landin
Cheryl G. Ragsdale
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA  23219

*Counsel for Amici Curiae
Drs. Alfred Franzblau, Lawrence Martin
and Daniel E. Banks*

Marc E. Williams
Robert L. Massie
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1035 Third Avenue, Suite 300
Huntington, WV  25701

*Counsel for Plaintiff-Appellant CSX
Transportation, Inc.*

Samuel L. Tarry, Jr.
Mitchell K. Morris
Earle Duncan Getchell, Jr.
MCGUIRE WOODS LLP
901 East Cary Street
Richmond, VA  23219

*Counsel for Plaintiff-Appellant CSX
Transportation, Inc.*

Daniel J. Popeo
Richard A. Samp
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Avenue, N.W.
Washington, DC  20036

*Counsel for Amicus Curiae
Washington Legal Foundation*

Evan M. Tager
Dan Himmelfarb
Michael B. Kimberly
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006

*Counsel for Plaintiff-Appellant CSX
Transportation, Inc.*

This same date, a copy of the brief was delivered via third party commercial carrier to all counsel at the above addresses.

s/ Walter P. DeForest

Walter P. DeForest
David J. Berardinelli
Matthew S. McHale
DEFOREST KOSCELNIK YOKITIS
KAPLAN & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA 15219
(412) 227-3100